**UNITED STATES of America, Appellee,**

v.

**Eldon Wayne McKUIN, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Walter Jerrold FREY, Appellant.**

**Nos. 19681, 19715.**

United States Court of Appeals, Eighth Circuit.

Oct. 16, 1970.

Certiorari Denied Feb. 22, 1971.

See 91 S.Ct. 875.

**392**

Hugh G. Roberts, Jr., Clayton, Mo., for Eldon Wayne McKuin.

Murry L. Randall, St. Louis, Mo., for Walter Jerrold Frey.

William C. Martin, Asst. U. S. Atty., St. Louis, Mo., for appellees; Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., on brief.

Before VAN OOSTERHOUT, MEHAFFY and LAY, Circuit Judges.

MEHAFFY, Circuit Judge.

After trial to a jury under a sixteen-count indictment charging a scheme of mail fraud (18 U.S.C. § 1341), defendant Eldon Wayne McKuin was convicted on thirteen counts and defendant Walter Jerrold Frey was convicted on eleven counts.[1] Each defendant was sentenced to a term of ten years. We affirm the judgments of conviction.

The issues raised by this appeal are (1) whether there was a prejudicial misjoinder of offenses and defendants; (2) whether there was prejudicial limitation of cross-examination of the witness Robert Davis regarding Walter Younge; and (3) whether there was prejudice to defendants when the witness Bishop took the Fifth Amendment which entitled them to a mistrial.

A full recitation of the salient facts is appropriate for an understanding of defendants' scheme of operation. At the time of the commission of the alleged offenses, Frey operated a marina and also the Jerry Frey Marine Sales Company in Alton, Illinois, and McKuin operated a telephone answering and secretarial service in Clayton, Missouri, a suburb of St. Louis. The general over-all scheme with which they were charged was working in concert to fraudulently obtain loans and credit cards in the names of other individuals without their knowledge or consent through the use of credit information which these individuals furnished to Frey when purchasing boats from him or through the use of information available to or obtained by the answering service. The names of the employers of these individuals where changed to companies serviced by the answering service, which verified the employment when inquiries were received. References given also included real or fictitious persons whose numbers terminated at the answering service. Callers who requested financial or employment information concerning these individuals were referred to McKuin or, if he were not present, employees were instructed by McKuin to give the information contained on file cards in his office. Favorable reports were given to assure that the loan or credit would be approved. The scheme included the establishment of fictitious residences for the people whose names were used as an aid in obtaining the desired credit. The separate counts of mail fraud concern the sending of forged applications, chattel mortgages, notes, credit information, etc. through the United States mails in furtherance of this scheme to defraud and for the purpose of "obtaining money, goods, wares, merchandise and other property by means of false and fraudulent pretenses, representations and promises."

The persons in whose names loans and/or credit cards were fraudulently obtained include Kenneth Pohlmann, William A. Hoover, Jess C. Cummings, Salvatore Levantino and Frederick Clemens.

---

1. Mrs. McKuin (Patricia Louise McKuin) was also convicted by the jury on Counts 10 and 15 of the indictment, but the trial court suspended her sentence and placed her on probation for a period of three years. Also named in the indictment as aiders and abettors were James Leroy Robinson, James Michael Rosenthal, Walter A. Younge, Jr., George Brown, Sarah Jean Daniel and Theodore James Gallagher, Jr.

Sarah Jean Daniel testified that she lived in an apartment with James Rosenthal and James Robinson and that she was present at conferences at the apartment attended by McKuin, Frey, Bill Bishop, George Brown, Rosenthal and Robinson where they discussed plans for fraudulently obtaining credit. She learned through their conversations that McKuin's answering service would take calls concerning Cummings, Levantino and Pohlmann and confirm the information given about them on credit applications; that Jess Cummings no longer lived in St. Louis but that Frey had credit information in his office concerning him and was going to use his name; that McKuin would get information on Levantino through his answering service; that the apartment leased by Frey in the name of Kenneth Pohlmann at 965 Dauphin Lane in Florissant, a suburb of St. Louis, was for the purpose of receiving mail for him; and that the apartment at 10087 Executive Drive South, St. Ann, a suburb of St. Louis, was rented for the purpose of receiving mail for Jess Cummings and Salvatore Levantino. She and Frey posed as Mr. and Mrs. Pohlmann when the Dauphin Lane apartment was leased and signed the lease as the Pohlmanns. She lived at 10087 Executive Drive South for about a week and took telephone calls for Cummings and also posed as his secretary when delivering a check for some furniture purchased in Cummings' name for the apartment. She also said that she went to the Boston Security Company office and signed a chattel mortgage as Mrs. Pohlmann and Rosenthal signed as Mr. Pohlmann, and that Frey, McKuin and Bill Bishop were also in on it. She was told by Rosenthal that she would have to sign or she would get knocked across the room. She was only seventeen years of age at the time and had lived in foster homes since she was fourteen months old.

In May, 1965 Kenneth Pohlmann and his wife bought a boat from Jerry Frey Marine Sales Company on a time-payment plan. Credit information was furnished to Frey and a loan was obtained from First National Bank & Trust Company of Alton, Illinois. In January, 1966 the Pohlmanns moved to Ohio. In September, 1966 a boat was purchased by McKuin and his wife, representing themselves as Mr. and Mrs. Kenneth Pohlmann, from Robert T. Smith, owner and operator of Campmarina at Osage Beach, Missouri. The boat was financed through Delta Loan & Finance Company using some of the Pohlmanns' credit references given to Frey and also names serviced by McKuin's answering service. Several payments were made in Pohlmann's name, one by S. W. McKuin with the name "Pohlmann" in parenthesis after it and several by E. W. McKuin. The balance due on the account at the date of trial was $6,815.66.

False applications in Pohlmann's name were made for credit cards from Mobil Oil Company and Central Hardware Company, using McKuin's address, 12318 Gravois Road, on the applications. The handwriting on the applications was identified as that of Frey. The employment reference and some of the credit references furnished were companies and individuals served by McKuin's answering service. Carte Blanche, Famous-Barr and Shell Oil Company credit cards were also obtained in Pohlmann's name using the 965 Dauphin address. These credit cards were subsequently used by McKuin and Frey for the purchase of merchandise. Famous-Barr lost a total of $2,170.97 on the Pohlmann account. The Pohlmanns testified that they did not sign nor authorize anyone else to sign their names to these documents.

William A. Hoover and his wife bought a boat from Frey in 1966 and gave him the requested credit information for obtaining financing. A loan was subsequently obtained from the Manchester Bank and secured by a note and chattel mortgage. Insurance on the boat was written for Hoover by Aetna Life & Casualty Company. Defendant Frey, using his own home address and Hoover's name, obtained another loan from the First National Bank of Alton, Illi-

nois to finance a boat of the same description, except for the serial number which was fictitious, and took out a policy of insurance on the boat with State Farm Fire & Casualty Company, calling in the information on the telephone. Subsequently, someone representing himself as William A. Hoover called the company and reported that the boat had sunk and made a claim for insurance. The caller stated that James Rosenthal, who lived on Executive Drive, was on board at the time of the accident. The caller also said that he was presently living at 12318 Gravois, which was McKuin's address. In making its investigation the insurance company was unable to locate Mr. Hoover and denied the claim, mailing a refund of premium to Hoover's stated address, which was Frey's home address, and the card acknowledging receipt of the check was signed by Jerry Frey. The check was endorsed "William A. Hoover" and cashed, but the real William Hoover testified that he never obtained the second loan or insurance, did not file a claim, and did not receive or cash the check. Edward M. Corbett, who was with the loan department of First National Bank in Alton, testified that seven installments were paid on the loan by mail and that the bank charged off $4,292.17.

Jess C. Cummings' name was similarly used to fraudulently obtain credit. He and his wife purchased a boat from Frey in 1963, giving the required financial information. In 1966 Frey applied for a Mobil Oil Company credit card in Cummings' name, listing his address as 10087 Executive Drive South (the rented apartment) and his former address as 12318 Gravois Road (McKuin's address). He gave the name of his employer as Colgate-Palmolive Company, the number of which terminated at McKuin's answering service. Applications by Cummings for credit cards were mailed from Alton, Illinois to Sears, Roebuck and Company and Central Hardware Company. Credit cards were also obtained from Sruggs-Vandervoort's giving Kenneth Pohlmann's name as a reference, but the real Jess Cummings testified that he did not know a Kenneth Pohlmann. A washing machine was purchased from Central Hardware by someone representing herself as Mrs. Jess Cummings but later identified as Mrs. McKuin. A washing machine fitting the same description was subsequently found at the McKuin's apartment and McKuin finally paid for the machine. McKuin, posing as Jess C. Cummings, purchased a car from the Buick-Pontiac dealer in St. Charles, Missouri. William Bishop, who was in charge of car financing, said he first talked with McKuin and then turned him over to a salesman, James Moenning. Moenning also sold Bishop's wife's car to "Kenneth Pohlmann."

Salvatore Levantino had formerly lived at 965 Dauphin Lane in Florissant, a suburb of St. Louis, but had moved to Phoenix, Arizona. His name was used to allegedly purchase a boat from Jess C. Cummings and financing in the amount of $3,600.00 was obtained from the Jefferson Gravois Bank, giving his current address as 10087 Executive Drive. Walter Younge testified that Frey signed Levantino's name and that he signed Mrs. Levantino's name. Levantino testified that he did not purchase the boat, obtain the loan, nor sign the note and mortgage, and that he never lived at the Executive Drive address. According to the vice president of the bank, the credit information on Levantino was telephoned in and the note, mortgage and bill of sale on the boat were mailed to the bank. The bonding company paid part of the loss and part of it was charged off.

Also, a loan in the amount of $4,000.00 was obtained on a boat allegedly sold to one Frederick Clemens by Charles Ross, a broker for the Jerry Frey Marine Sales Company. Maurice K. Smith, who was General Manager of Allied Concord Finance Corporation in 1966, testified that the company received credit references and other information concerning Clemens from Frey over the telephone. Smith requested Frey to furnish a survey report and note which were sent to

him through the mail. Joseph Sherlock, Jr., a salesman for Frey, testified that his name on the survey report was forged. A check was issued to Jerry Frey Marine Sales & Service for $4,000.-00 and endorsed by Frey. When the loan was not paid and an attempt was made to locate the maker, it was discovered that the answering service had verified Clemens' employment at Allied Chemical Corporation, which was untrue. Walter Younge allegedly brought the man in to purchase the boat and received a commission, but the real "Fred Clemons" who was a friend of Younge's testified that he did not purchase a boat and had never worked for Allied Chemical Corporation. The serial number given was a fictitious number. Apparently, the loan was obtained on a nonexistent boat, and the lender lost most of the money.

■ We find no merit to defendants' contention that there was prejudicial misjoinder of offenses and defendants and that the court abused its discretion in denying defendants' motion for severance.

Fed.R.Crim.P. 8(a) provides for joinder of offenses where the crimes are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan. Paragraph (b) of said rule further provides that "two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses" and that "such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

It is clear from the evidence that Mc-Kuin and Frey devised and intended to devise one over-all scheme to defraud and cooperated and worked in concert in violation of the statute. See Pritchard v. United States, 386 F.2d 760, 764 (8th

Cir. 1967), cert. denied, Borchelt v. United States, 390 U.S. 1004, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968). A handwriting expert, George H. Vollertsen, testified that the applications for credit cards were in the handwriting of Frey. On the other hand, McKuin, through his answering service, was instrumental in obtaining credit approval by the giving of fictitious information concerning the applicants. It matters not that the credit cards were used separately by McKuin and Frey and that they obtained separate loans through the use of the over-all scheme or plan. These transactions were carried on and made possible by the use of the over-all scheme, each assisting in and making it possible for the other to fraudulently obtain the money or merchandise.

This case is readily distinguishable from the case of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L. Ed. 1557 (1946), relied upon by defendants, where the Court held that the indictment was duplicitous in that the proof showed a *multiplicity of schemes* rather than a single scheme. In *Kotteakos*, fraudulent loans were obtained by a broker for various individuals. The Court found that there were actually eight or more different conspiracies, none of the participants of the individual conspiracies having any knowledge of the other conspiracy except the broker. The Court therefore found that it was prejudicial error to try all of the participants in the individual conspiracies at one time. In Blumenthal v. United States, 332 U.S. 539 (1947), the Court, in distinguishing *Kotteakos*, said at pp. 558–559, 68 S.Ct. 248, at p. 257, 92 L.Ed. 154:

"The case therefore is very different from the facts admitted to exist in the *Kotteakos* case. * * * [N]one aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to

others as well as in specific object and result. There was no drawing of all together in a single, over-all, comprehensive plan.

"Here the contrary is true. All knew of and joined in the overriding scheme."

The same reasoning is applicable to the facts here.

In the recent case of United States v. Sheehan, 428 F.2d 67 (8th Cir. 1970), we affirmed the convictions of the defendants under an indictment charging the use of the United States mails in the fraudulent sale of hearing aids in violation of 18 U.S.C. § 1341. It was there contended that the evidence showed that each defendant and each salesman operated separate from a common scheme to defraud which constituted a fatal variance in the indictment alleging a single scheme, but we disagreed. In support of our holding that there was one overall scheme to defraud, even though defendants were not always associated with the same company at the same time, we quoted from Friedman v. United States, 347 F.2d 697, 708 (8th Cir. 1965), as follows (428 F.2d at 76):

"'We think it well established that there was one overall scheme to defraud and that this overall scheme encompassed both the Minneapolis and St. Paul studios. It was not essential to a determination of guilt herein that Lowery should have been instrumental in each operation or in the operation out of the St. Paul Studios. While Lowery's activities could have been limited to the Minneapolis studio, the jury could well have found, as they undoubtedly did find, that he was aware of what was going on in the St. Paul studios also. In a somewhat similar situation, this court recently said in Koolish v. United States, 8 Cir., 1965, 340 F.2d 513, 525, certiorari denied, 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724:

"' "We are fully satisfied from an examination of the tremendous record here that substantial evidence supports the jury finding that there was an overall conspiracy to defraud and to obtain money and property from the Kenny Foundation and its donors, that each of the appellants cooperated with the others and each knowingly joined in the conspiracy, and that use of the mails to defraud was established in furtherance of the overall objective. It is immaterial whether or not there were minor conspiracies or schemes inside the overall conspiracy to obtain money from the Kenny Foundation and its contributors through false and fraudulent pretenses, representations and promises and that some of the defendants participated in some of these inner or smaller schemes but not in all of them." ' "

It is thus immaterial to the proof of an over-all scheme that separate purchases were made and loans obtained by McKuin and Frey within the framework of the common plan. All of the cases relied upon by defendants are factually dissimilar.

We said in Johnson v. United States, 356 F.2d 680, 682 (8th Cir. 1966), that under Rule 8(a), Fed.R.Crim.P., joinder of offenses is ordinarily appropriate where, as here, the specific counts refer to the same type of offenses occurring over a relatively short period of time, and the evidence as to each count of necessity overlaps. Furthermore, under Rule 14, Fed.R.Crim.P., it is well settled that the trial court has a wide range of discretion in granting separate trials on different offenses and for different defendants, and in order to secure a reversal it must be affirmatively shown that prejudice resulted from the failure to grant separate trials. Fisher v. United States, 324 F.2d 775, 780–781 (8th Cir. 1963). To the same effect, see United States v. Christian, 427 F.2d 1299 (8th Cir. 1970). Cf. Gresham v. United States, 374 F.2d 389, 390 (8th Cir. 1967).

The court properly determined that the joinder of offenses and that the joinder of defendants were proper under

Rule 8 and the court did not abuse its discretion in determining that the defendants had not demonstrated that they were entitled to relief from prejudicial joinder under Rule 14. The defendants have likewise failed to prove a fatal variance between the allegations of the indictment and the proof.

■ Also without merit is defendants' next contention that it was reversible error for the court to sustain defendants' objection to the question asked Robert Davis, an employee of Frey's, on cross-examination, whether there came a time when he was instructed by Frey not to give any further credit to Walter Younge. The court sustained the objection on the ground that the question was immaterial. On direct examination Davis had merely testified that he had worked for Frey for three or four years and had identified his handwriting. Frey contends on appeal (although he did not mention it at the time the objection was made) that he was attempting to show a cause for Younge to be biased against Frey and that Davis should have been permitted to answer the question. Davis did testify that Younge did not come around the marina in July and August, 1966, and Donald Hull, a salesman for Frey, was called by the defendants and testified that Frey did not want Younge around there and that they tried to discourage him by cutting the water line off to his boat, cutting his electricity off, running him out of the harbor, and doing everything they could to get rid of him. Any testimony which Davis might have given concerning Younge's credit having been cut off by Frey would have been merely cumulative to the other evidence. We agree with the principle enunciated in the cases cited by defendants that considerable latitude should be granted on cross-examination but we perceive no way in which defendants could have been prejudiced by the court's ruling and find no abuse of discretion.

■ Finally, the court did not err in refusing to grant a mistrial when the witness William Bishop refused to answer certain questions under his Fifth Amendment privilege. Bishop was called by the government and asked to identify the person who signed the name "Jess C. Cummings" to certain papers in connection with the purchase and financing of a car. Bishop was a salesman in charge of financing at Ken Bender Buick-Pontiac Inc. in St. Charles, Missouri in 1966 when a car was sold to Cummings and a loan obtained to finance it. Bishop stated on the witness stand that the man representing himself as Cummings was Wayne McKuin but that he turned him over to another salesman and did not recall who signed the papers and was not sure whether he saw them signed. The court asked the jury to leave the room and warned Bishop that other witnesses had testified concerning his involvement in the case, and, in effect, warned him that he had better tell the truth. Thereafter, Bishop took the Fifth Amendment when he was asked whether he took the credit information for the financing of the car sold to Cummings and whether he sold an automobile to Kenneth Pohlmann. On cross-examination he refused to answer when asked whether he had been unemployed since June, 1968 and also refused to say whether he knew a phony or fictitious name was being used at the time the automobile was purchased by Pohlmann.

Subsequently, defense counsel asked that a mistrial be granted on the ground that Bishop's taking the Fifth Amendment was prejudicial to defendants. Counsel also stated that the prosecution must have known that he would take the Fifth Amendment and led him on until he did. The court overruled the motion, commenting as follows:

"If you recall, during the examination I sent the jury out and talked to him about his statement, and at that time I asked for the paper, statement, which he hadn't made, but which had been made by Mr. Rudy, and which you gentlemen have seen, and I think the answer to the question that you gentlemen asked him on which he took

the Fifth, in my opinion, shows that he gave them the information about that."

Then the court asked the government's attorney if he had any information that Bishop was going to take the Fifth and he said he did not—that it came as a complete surprise to him. The court overruled the motion on the basis that the questions which Bishop refused to answer were answered in the statement made by him to the postal inspector Rudy, and on the further basis that the government's attorney had no idea that he would take the Fifth Amendment. The court then instructed the jury as follows:

> "Ladies and gentlemen of the jury, during the time that the witness Bishop was on the stand, William Bishop, which was the witness ahead of Mr. Bahlinger, who is on the stand now, in reply to some questions, and I won't undertake to tell you the number because your recollection will govern that, that he did not answer on the basis of the Fifth Amendment.

> "You are not to consider that in any way with respect to this case. Just strike that answer out of your mind entirely. It's not to be considered by you in arriving at your verdict in any respect, but insofar as it is humanly possible to treat it as if you had never heard it, wipe it out of your mind."

Defendant admits that there is substantial authority that the assertion of the Fifth Amendment privilege by a witness under the circumstances presented here is not reversible error. In Namet v. United States, 373 U.S. 179, 186–187, 83 S.Ct. 1151, 1154–1155, 10 L. Ed.2d 278 (1963), the Court said:

> "None of the several decisions dealing with this question suggests that reversible error is invariably committed whenever a witness claims his privilege not to answer. Rather, the lower courts have looked to the surrounding circumstances in each case, focusing primarily on two factors, each of which suggests a distinct ground of error. First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. * * * A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant. * * * On the other hand, courts have failed to find reversible error when such episodes were 'no more than minor lapses through a long trial.' (Citing cases.) And even when the objectionable inferences might have been found prejudicial, it has been held that instructions to the jury to disregard them sufficiently cured the error."

See also and compare United States v. Edwards, 366 F.2d 853, 870 (2d Cir. 1966).

Defendants rely on the second theory that the refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination. We agree with the district judge, however, that critical weight was not added to the prosecution's case and that no prosecutorial misconduct occurred. Furthermore, any possible prejudicial error was cured by the court's instructions. Namet v. United States, *supra*.

Finding no error, the judgment of the district court is affirmed.