COMMONWEALTH *vs.* PETER LEO MARTIN.

Worcester.    December 6, 1976. — April 21, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Evidence,* Privilege against self-incrimination. *Practice, Criminal,* Opening statement by prosecutor, Agreement for immunity from prosecution. *Witness,* Self-incrimination, Immunity.

Where a prosecutor acted in good faith when he outlined in his opening the expected testimony of a witness who had agreed to testify prior to trial but claimed his Fifth Amendment privilege on the stand without warning, where the prosecutor's questioning was not extended nor suggestive of particularized states of fact, and where the entire record made a thoroughly convincing case against the defendant apart from any inferences that might have been drawn from the witness's refusal to testify, the witness's claim of his Fifth Amendment privilege in the presence of the jury did not require the judge to declare a mistrial. [419-423]

INDICTMENTS found and returned in the Superior Court
on September 19, 1974.

The cases were tried before *Zarrow, J.*

*Adam M. Lutynski* for the defendant.

*James P. Donohue,* Assistant District Attorney, for the
Commonwealth.

KAPLAN, J.   The defendant and one Leo Farland were
indicted for the crimes of murder in the first degree and
armed robbery arising from an episode at Ascension
Church in Worcester in which Chester F. Szklarz was
robbed and killed. Farland was tried first. When the trial
was well under way he pleaded guilty to murder in the
second degree and armed robbery. Sentencing on the
armed robbery was deferred. Farland agreed to give tes-
timony in the forthcoming trial of the present defendant.[1]
When called as a prosecution witness in that trial, Farland
answered some of the prosecutor's questions but refused
answers to a number of others, claiming a privilege against
self-incrimination. The jury found the defendant guilty of
the crimes as charged. On his present appeals pursuant to
G. L. c. 278, §§ 33A-33G, from the judgments of conviction,
the defendant argues two assignments, both in effect claim-
ing error in the judge's denial of a motion to declare a mis-
trial when Farland left the witness stand.

There would be agreement about some general proposi-
tions. When a witness in a criminal case refuses to answer
questions on the ground of self-incrimination, lay triers
may readily, although improperly, make invidious infer-
ences associating the witness with the defendant in all il-
legal enterprise;[2] and the prejudice to the defendant may
be especially hard to remove because he cannot cross-
examine the witness as to "testimony" which is in the form

---

[1] Indicted by the grand jury for Worcester County, the defendant
moved for a change of venue, and trial was conducted in Marlborough,
Middlesex County.

[2] See *United States* v. *Maloney,* 262 F.2d 535, 537 (2d Cir. 1959);
*Richardson* v. *State,* 246 So. 2d 771, 777 (Fla. 1971).

of a kind of riddling silence.[3] Nevertheless, as has been observed, convictions are not vulnerable to reversal in all cases where witnesses assert Fifth Amendment privileges in the face of a jury. There are two general occasions for reversal. It may be called for when there is definite prosecutorial misconduct — questioning of a material witness in order to provoke a claim of privilege with a deliberate design to raise those improper inferences in the minds of the jury.[4] Further, quite apart from misconduct of the prosecutor, there is reversible error when the impression made on the jurors by the witness's demurral is thought to add the "critical weight"[5] that brings about the verdict of guilty. See generally Commonwealth v. Martino, 361 Mass. 720, 722 (1972); Commonwealth v. Granito, 326 Mass. 494, 497-499 (1950); Frazier v. Cupp, 394 U.S. 731, 733-737 (1969); Namet v. United States, 373 U.S. 179, 185-191 (1963).

Attempting to relate the present case to the foregoing propositions, we first summarize the evidence given by the prosecution witnesses including Farland (the defense rested without offering any witnesses). We then dwell on the prosecutor's conduct with respect to Farland. Finally we make our appraisals.

1. On July 21, 1974, a Sunday, about 11:30 A.M., the victim Szklarz, who had been serving as a sexton at mass at Ascension Church, No. 40 Vernon Street, was walking toward the rectory, located next to the church, carrying two bags which contained the collections made at the service. A sound was heard, like that of a firecracker; the victim threw up his hands and fell. In an instant a male figure, emerging from the side of the church and running toward the victim, picked up one of the bags lying on the ground, crossed Vernon Street to No. 39, and ran on the

---

[3] See Douglas v. Alabama, 380 U.S. 415, 419-420 (1965); United States v. Maloney, 262 F.2d 535, 537 (2d Cir. 1959).

[4] We do not and cannot decide today whether such conduct justifies reversal regardless of the strength of the rest of the case against the accused. Cf. Frazier v. Cupp, 394 U.S. 731, 737 (1969).

[5] Quoted from Namet v. United States, 373 U.S. 179, 187 (1963).

path by the side of that house leading to the side stairs. There he was lost to view.[6]

Police, quickly summoned by another sexton who had seen the happening, arrived in a minute's time. The victim was dead of a wound originating in his left upper chest caused by a .22 caliber projectile which, as later appeared, could have been fired from No. 39, at a distance of about eighty-three feet.[7]

The involvement of the defendant and Farland was shown by the converging testimony of a number of witnesses. The defendant with his wife and three children occupied the first floor of No. 39, a "three-decker." On the night of July 20, Farland had called the defendant at the latter's request, and agreed to come to the defendant's apartment the next morning at 8 A.M. (The two worked at the same plant and had been friendly.) Farland testified that he drove his car next morning to Pattison Street near Vernon Street, parked it, and appeared at the defendant's apartment as agreed. He spent some time with the defendant and his wife, and about 10 A.M. entered the church, inquired of a sexton about the time of mass, and returned to the defendant's apartment with a copy of the church bulletin. Later he left the apartment. Around this time a woman from the third floor of No. 39 saw Farland, whom she knew, engaged — strangely, she thought — in chopping some branches from a tree in front of No. 39 (and so in a line of sight from the first-floor front bedroom to the vicinity of the church across the way).

After the gunshot and the flight of the robber, the defendant came out of No. 39, approached the victim's body, and then turned back to No. 39, where he encountered Robert Pardee, occupant of the second floor. The defendant remarked that "whoever did shoot him was a

---

[6] We speak from the perspective of the testimony of two observers, Sullivan (a sexton) and one Quinn.

[7] The police promptly carried out a rudimentary search of No. 39 after a talk with the defendant and his wife. The defendant said no one had entered the house.

pretty good shot because he shot him once right through the heart." Pardee reminded the defendant of a conversation they had had the previous November when Pardee was out of work and needed money. According to Pardee, the defendant (in the presence of their wives) had suggested that it would be an easy matter for someone to shoot the sexton on his regular Sunday walk to the rectory, with a confederate picking up the collection bag. The defendant now answered Pardee that he wouldn't try anything like that.

Around 12:30 P.M. the defendant with his wife left No. 39 and drove to the house of Mrs. Barbara Lizotte. There they picked up Mrs. Lizotte and her two children, together with their own three children who had been with Mrs. Lizotte, and all proceeded to Boston. After a visit with a friend of Mrs. Lizotte at a hospital, they went to the Franklin Park zoo. On the return to Worcester starting at 4:30 P.M., the defendant said reflectively to his wife in the hearing of Mrs. Lizotte that he "didn't mean to kill the guy." Mrs. Martin said, "You . . . Peter. Now she knows, too."

In the early evening, the police spoke to the defendant at No. 39. The defendant said he knew Farland. He had last seen Farland leaving No. 39 about 9 A.M. The police had reason to believe that the latter statement was a lie.[8]

Farland was surprised by police at his parked car, taken to the detective bureau sometime after 7:30 P.M., and later that night gave a statement which enabled the police to procure a warrant for search of the defendant's premises. In the search about 1 A.M., July 22, the police found and took from the apartment the bag and contents stolen from the victim; two rifles, one of these a .22 caliber Winchester model 190 semi-automatic; live cartridges fitting the .22 rifle;[9] a "scope" apparently fitting the .22 rifle; and a shirt,

---

[8] It appears that one of the defendant's daughters told the police that Farland had been at No. 39 until 7 P.M.

[9] Although the .22 rifle was registered to his wife, the defendant recognized it as his when he saw it at the detective bureau.

bluejeans, and tennis shoes that could match Farland's description of the clothes he was wearing that morning. Tests carried out later by the police indicated that the spent .22 projectile taken from the victim's body could have been fired from the .22 rifle, though there was not sufficient basis for a positive opinion that it had been so fired.[10]

2. In his opening speech to the jury, to which no objection was taken,[11] the prosecutor indicated that Farland's contribution as a witness would be to admit that he was the man who seized the collection bag, and otherwise to fill in the actions and observations from his side. Thus — omitting mention of matters on which evidence was actually received at trial, as summarized above — Farland was expected to testify: At the defendant's apartment on the morning of July 21, there was talk (with the defendant's wife present throughout) of the defendant's shooting the sexton. The defendant loaded the .22 rifle. He gave Farland a hatchet and sent him out to remove branches in order to clear the view. Farland's instructions were to run after the pickup to No. 39 and throw the bag into the defendant's apartment through the side door that would be kept open; to go to the cellar where he would change his shirt, and remove the mascara with which he would be earlier provided; and to remain there until signalled. This plan was substantially carried out. When Farland came upstairs after the signal,[12] he saw the defendant clean the rifle and there was discussion of how the money would be split. Farland was further to change his clothes and to stay in the apartment while the defendant and his

---

[10] There was also expert testimony relating a branch lying in front of No. 39 to a broken limb of the tree in the line of sight.

[11] Indeed, at defense counsel's request the prosecutor recounted beforehand to counsel and the judge what he proposed to say in his opening statement.

[12] It appears that Farland was actually in the bathroom of the first floor apartment when police officer Towner looked through the premises, but he was not detected.

wife went to Boston. (It appears that Farland in fact did not leave the apartment until the evening. The encounter at his parked car and his later statement to the police have been noted.)

So much for the prosecutor's statement. Called as the sixth of the prosecution's nineteen witnesses, Farland testified in general terms up to the point where he gave the defendant the church bulletin. Asked whether he left No. 39 sometime later, Farland said, "Fifth Amendment." The jury being withdrawn, the judge reminded Farland that he had pleaded guilty and agreed to testify. At first Farland said he realized after his plea that he had not acted voluntarily, that his attorney had been overbearing; but in the later colloquy he receded from this explanation.[13]

The judge sent for Farland's counsel and said he thought Farland had no privilege. The defendant's counsel broke in to suggest that the prosecution could represent that no further proceedings would be brought against Farland based on the Ascension Church episode, which would, presumably, assure the elimination of any privilege.

Continuing discussion with the judge, Farland freely admitted he had been "part and parcel" of the scheme to rob the church, but he was not clear — did not exactly remember — could not say — who killed the sexton; probably it was the defendant, probably the defendant's wife, probably someone else. Farland was now told that he need only testify to his own best recollection. The prosecutor added his blanket promise that Farland would not be further prosecuted. On his counsel's statement that the only way he could get into trouble would be to lie from the witness stand, Farland indicated he would testify.

But after further conference with Farland, his counsel returned to say that he didn't really know what Farland would do. It had occurred to counsel that, in the face of the statute providing a fixed procedure for granting immunity to witnesses (see G. L. c. 233, § 20F), the prosecu-

---

[13] Farland's counsel said Farland had called him and stated affirmatively that he wanted to make the guilty pleas.

tor might not be empowered otherwise to agree effectively not to prosecute. Although as a practical matter Farland had better testify, counsel thought he might have a technical privilege; possibly he could still be charged with conspiracy.

Counsel conferred again with Farland and reported giving him this "practical" and "technical" advice. According to counsel, Farland now felt he didn't want to testify. The judge said he would inform Farland he had no privilege and order him to answer proper questions. When the prosecutor said he would continue with Farland, Farland's counsel said that was "good news."

Recalled to the stand (the defense did not object at the time), Farland repeated his claim of privilege as to the question whether he left No. 39 that day. The judge in this and subsequent instances ordered Farland to answer. Farland similarly refused an answer to the question whether he recognized an exhibit picturing an area in front of No. 39. Defense counsel then interposed to suggest that, to avoid prejudice, the witness be excused, or the prosecutor move to a different line. The prosecutor said he would put just a few more questions. Farland answered some five questions about having talked to the prosecutor and the police. He then asserted privilege on the questions where he was located when he first talked to the police on the evening of July 21; whether he had given a signed statement; whether he had pleaded guilty. When the prosecutor asked how long Farland talked with the police at their first encounter, defense counsel objected, whereupon the prosecutor indicated he was concluding with the witness. He asked whether Farland had made a tape that night, and on eliciting a refusal, closed the interrogation. Defense counsel said he had no questions and moved for a mistrial, which was refused. The judge immediately instructed the jury that in deciding the guilt or innocence of the defendant they were to put out of consideration the witness's claims of privilege and refusals to answer.

3. Of course the prosecutor was acting in good faith when, in his opening speech, he gave the jury a précis of

Commonwealth *v.* Martin.

the testimony to be expected from Farland, for he had Farland's agreement to testify. See *Commonwealth* v. *Hartford,* 346 Mass. 482, 486 (1963); *Commonwealth* v. *Clark,* 292 Mass. 409, 410 (1935) ("As a general rule, counsel is free to state in his opening anything that he expects to be able to prove by evidence"). Farland's claim of privilege came without warning after he had given consecutive testimony.[14] The prosecutor did not attempt to persist in his questioning.[15] In the seesawing conversations out of the jury's hearing, it was first assumed by all that Farland had no privilege, at least if the prosecutor should promise, as he proceeded to do, that he would forbear any further prosecution. At this point Farland seemed prepared to testify to his best recollection.

After Farland's counsel introduced the thought that Farland's immunity might not be complete,[16] it remained doubtful what Farland would do: he might take his counsel's practical rather than technical advice. When Farland's counsel said that the procecutor's decision to recall Farland was "good news," he may well have meant that his client now would have, and might take, the opportunity to testify fully, and thus possibly better his chances on sentencing day. The factual situation sums up as one where a prosecutor need not go on an assumption that a witness, if called, will balk at testifying, but may make the test by actually calling him. See *Weinbaum* v. *United States,* 184 F.2d 330 (9th Cir. 1950); *People* v. *Scheidt,*

---

[14] See *United States* v. *McKuin,* 434 F.2d 391 (8th Cir. 1970), cert. denied, 401 U.S. 911 (1971).

[15] See *People* v. *Scheidt,* 182 Colo. 374, 384 (1973).

[16] As to the exclusiveness of the statutory immunizing procedure, see *Grand Jurors for Middlesex County for the Year 1974* v. *Wallace,* 369 Mass. 876 (1976); and as to the possibility of maintaining a prosecution for conspiracy, see *Kuklis* v. *Commonwealth,* 361 Mass. 302, 306-307 (1972); *Commonwealth* v. *Mahoney,* 331 Mass. 510, 512 (1954); *Commonwealth* v. *Shea,* 323 Mass. 406, 411-412 (1948). Cf. G. L. c. 278, § 2A. Whether or not the claim of privilege was valid, there remained a doubt about Farland's asserting it when he resumed the stand.

182 Colo. 374, 384 (1973).[17] In all events it was evident that as to some matters not central to the killing, as Farland perceived them, he would testify as he had done earlier.[18] The prosecutor did get answers on the periphery, but as he approached the center Farland claimed his privilege. The questioning was not insistent or extended, nor did it suggest particularized states of fact from which the jury might the more easily draw harmful inferences. Compare *Cota* v. *Eyman,* 453 F.2d 691, 694 (9th Cir. 1971), cert. denied, 406 U.S. 949 (1972); *State* v. *Mitchell,* 268 Minn. 513, 520-521 (1964), cert. denied, 380 U.S. 984 (1965), with *Fletcher* v. *United States,* 332 F.2d 724, 726 (D.C. Cir. 1964); *Washburn* v. *State,* 164 Tex. Crim. 448, 450-453 (1956). If the prosecutor went too far in his final questions, that distance was small and the fault venial. Cf. *United States* v. *McKuin,* 434 F.2d 391, 397-398 (8th Cir. 1970), cert. denied, 401 U.S. 911 (1971); *United States* v. *Terry,* 362 F.2d 914, 916-917 (6th Cir. 1966). In his closing argument the prosecutor did not mention the witness's refusal to testify. See *Cota* v. *Eyman, supra* at 694-696; *United States* v. *Edwards,* 366 F.2d 853, 870 (2d Cir. 1966), cert. denied sub nom. *Parness* v. *United States,* 386 U.S. 919 (1967).

As to the "weight" that Farland's negatives might lend improperly to the case against the defendant, we note again that the questions put, and refused answers, were not themselves "fact laden";[19] but then we have to recall that the prosecutor's opening statement was rather de-

---

[17] If it had been clear that the witness would not give substantive testimony, he should not have been recalled. Contrast *United States* v. *Romero,* 249 F.2d 371, 375 (2d Cir. 1957); *State* v. *Yager,* 416 S.W.2d 170 (Mo. 1967). It is suggested, indeed, that where there is doubt what the witness will do, it is sound practice to put the substantive questions to him under oath in the absence of the jury in order to determine whether he should be recalled before the jury and how he should then be interrogated. See *San Fratello* v. *United States,* 340 F.2d 560, 565 (5th Cir. 1965); *State* v. *Cullen,* 103 N.J. Super. 360, 363-365 (1968).

[18] Cf. *Namet* v. *United States,* 373 U.S. 179, 188 (1963).

[19] *Washburn* v. *State,* 164 Tex. Crim. 448, 451 (1956).

tailed in its forecast of what Farland might say. Yet the usual asseverations had been made by counsel and the judge that the remarks of counsel were not evidence.[20] It is hard to say whether the judge's ordering the witness to testify, indicating that the claim of privilege was invalid, would encourage or discourage the jurors in drawing the prohibited inferences. Cf. *Commonwealth* v. *DuVal*, 453 Pa. 205, 217 (1973). In all events, the jury received promptly a cautionary instruction not to build on Farland's claim. *United States* v. *McKuin, supra* at 398. *United States* v. *Brickey*, 426 F.2d 680, 688 (8th Cir.), cert. denied, 400 U.S. 828 (1970). That the entire Farland interlude did not loom large is suggested by the fact that defense counsel let the judge's final instructions pass without seeking a further curative charge. See *State* v. *Mitchell*, 268 Minn. 513, 520 (1964), cert. denied, 380 U.S. 984 (1965).

But perhaps the more significant point is that the entire record makes a thoroughly convincing case against the defendant on the charges of the indictments entirely apart from any dubious aid the jury might have attempted to derive from Farland's behavior on the stand. Consider the evidence of a prior criminal conception from Pardee's testimony, of step by step execution of a plan, of possession of the means and fruits of the commission of the crime, of admission of guilt in Mrs. Lizotte's presence, and of prevarication to conceal. For affirmance of the conviction we need not find that no "weight" was added, although that may indeed have been the case; we need only find, as we do, that what was added could not have made the difference between acquittal and conviction. Compare *Frazier* v. *Cupp*, 394 U.S. 731, 735 (1969); *Namet* v. *United States*, 373 U.S. 179, 189 (1963); *United States* v. *Brickey*, 426 F.2d 680, 688 (8th Cir.), cert. denied, 400 U.S. 828 (1970), with *Robbins* v. *Small*, 371 F.2d 793, 795 (1st Cir.

---

[20] See *Commonwealth* v. *Hartford*, 346 Mass. 482, 486 (1963); *Commonwealth* v. *Howard*, 205 Mass. 128, 145-146 (1910); *Frazier* v. *Cupp*, 394 U.S. 731, 734-736 (1969).

1967); *Fletcher* v. *United States,* 332 F.2d 724, 726-727 (D.C. Cir. 1964).

4. We find no basis for mitigation of the sentence or other relief under G. L. c. 278, § 33E.

*Judgments affirmed.*