COMMONWEALTH vs. PETER KANE.

Bristol.  November 2, 1982. — February 7, 1983.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, & NOLAN, JJ.

*Homicide.  Malice.  Practice, Criminal,* Required finding.  *Witness,* Privilege, Refusal to testify.

At the trial of a male adult for the murder of a two year old child, testimony that the defendant struck the child frequently over a long period of time; that the child was severely bruised, unconscious, and not breathing after his mother left him in the defendant's care for a short period; and that the defendant's conduct thereafter showed consciousness of guilt, together with expert medical conclusions as to the cause of death and the infliction of the fatal injury by a severe blunt force, supported an inference that the head injury which was the primary cause of death resulted from a blow or blows of the defendant's hand or fist and permitted the jury to infer malice, warranting their verdict of guilty of murder in the second degree.  [133-134]

The judge at a murder trial did not abuse his discretion by denying the defendant's motion that the prosecution be instructed not to question a certain witness before the jury as to a private conversation which the witness, a Roman Catholic priest, had had, with the defendant, even though the priest had stated during a voir dire that he would refuse on religious grounds to testify respecting the conversation, where, in the context of the trial itself, during which other testimony tended to show that the conversation was innocuous, there was no showing either that the prosecution had consciously attempted to build its case out of inferences arising from the priest's silence or that his refusal to testify on this point added critical weight to the prosecution's case.  [135-140]

INDICTMENT found and returned in the Superior Court Department on May 29, 1980.

The case was tried before *Prince, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*James H. Fagan* for the defendant.

*Patricia O. Ellis,* Assistant District Attorney (*Phillip L. Weiner,* Assistant District Attorney, with her) for the Commonwealth.

HENNESSEY, C.J. The defendant was convicted by a jury of murder in the second degree of a two year old boy.[1] The defendant appealed, and now asserts error in the judge's denial of the defendant's motion for a required finding of not guilty of the charge of murder, and in the judge's permitting testimony by a priest who refused to disclose to the jury the details of a conversation which he had with the defendant, thereby unfairly prejudicing him. We transferred the appeal to this court on our own motion. We conclude that there was no error, and we affirm the judgment of conviction.

On May 15, 1980, the two year old victim was pronounced dead at Rhode Island Hospital after suffering irreversible brain damage and lapsing into a coma seven days earlier. From January, 1980, until the time of his death, the victim had lived in an apartment in North Attleborough, Massachusetts, with his brother who was three years old at the time, his mother, and the defendant, Peter Kane.

The defendant had a regular practice of going into the children's bedroom, closing the door, and thereafter repeatedly striking the boys. On such occasions loud slapping sounds could be heard followed by the children's cries. After a period of time, the defendant would emerge from the room visibly upset and shaking his hand, which appeared red and swollen. Following one such incident, the defendant referred to the children as "little bastards."

The children's aunt testified that during one night in February, 1980, while she was visiting the apartment she heard the victim cry out for his mother on three separate occasions. Each time the defendant would respond by going into the child's room and closing the door. She then heard loud whacking sounds followed by his screams and cries.

---

[1] At the close of all the evidence the judge had allowed the defendant's motion for a required finding of not guilty of so much of the indictment as charged murder in the first degree.

During the month of March, the defendant's abuse intensified and became more focused on the victim. The defendant hit the baby hard nearly every day during the months of March, April, and early May, and on one occasion tied the child to a door with a belt. The defendant would strike him about the back, buttocks, face, and head severely enough to leave bruises.

On numerous occasions, the defendant administered marihuana to the victim, forcing the smoke into the child's mouth if the child attempted to resist. The abusive beatings by the defendant were usually brought on if the child cried for his mother, or disturbed the defendant while he was relaxing or, most often, when the child neglected to use the toilet.

During the latter part of April, as a result of a beating by the defendant, the child's right hip became swollen and he experienced difficulty walking. His mother took him to a hospital where Dr. Paul Azer noted a number of bruises on the boy's face, neck, and limbs which he estimated to be at least four or five days old, and some bruises possibly two or three weeks old. Dr. Azer's examination did not reveal any neurological damage to the child at that time, nor did the doctor observe any of the bruises which were subsequently found just before the child's death. As a result of the doctor's filing a report of suspected abuse, a social worker visited the apartment to investigate the injuries to the child. At some point following this interview, the mother told the defendant not to hit the children so hard as to leave marks because she did not want the "welfare workers" asking any more questions.

On May 6, Joann Dunn, a child welfare specialist, visited the home. Dunn testified that the child appeared drowsy and cranky, but that she did not see the bruises which were present on May 8.

On the morning of May 8, the children got up about 10:30 A.M. and were fed by Mark Henderson, who was living in the apartment temporarily. This breakfast consisted of a bowl of cold cereal which, as usual, was to be the children's

sole meal of the day. Henderson, who left for work about 1 P.M., testified that he did not observe the bruises which were present later that day.

In the late afternoon of May 8, the victim's mother went out to the store with another one of her sisters. Before she left she told the defendant where she was going and she then checked her son, who was on his bed. She observed her son from a distance of two and one-half feet but did not observe the bruises that were present later that day. She testified that she did not strike the child that evening. Her sister also testified that she did not observe the bruises.

The two women left the apartment about 6:15 P.M. The defendant, who was alone in the apartment with the two boys, lay down on a cot in his bedroom to get some rest. The women returned to the apartment within twenty minutes to one-half hour, and the mother went directly into her bedroom to find the defendant reclining on the cot. She shook his foot and he got up right away, which according to her was unusual. The defendant then indicated that he thought that she had come in earlier because he had heard a "thump." Thereafter, the defendant immediately followed her into the kitchen and said, "Let's go check on [the victim] and get him up for supper." The mother testified that this was also unusual behavior for the defendant. The defendant then went to the victim's bedroom and screamed for the mother, who came to the room to find the child unconscious and not breathing.

Both the defendant and the mother testified that the child was found lying on the floor in his bedroom with his arm wrapped around a hobbyhorse. While the mother attempted to give him mouth to mouth resuscitation, the defendant listened to see if the child had a heartbeat. The defendant then yelled for the sister to call an ambulance. Shortly thereafter the mother started slapping the defendant and shouted to him, "What did you do with my baby? He was all right when I left."

Emergency medical technicians arrived. Their examination of the boy revealed that he was unconscious and cyanotic

with no pulse or respiration. The child's pupils were fully dilated and nonreactive to light. There was no blockage found in his mouth. However, bruises were observed on his face and hip. The baby was taken to a hospital. When the defendant arrived at the hospital and entered the room, the mother was heard to exclaim, "Don't let him near my baby. He hurt my baby." The defendant did not say anything in response.

At the hospital Dr. John Killion noted certain bruises on the boy's right forehead, left cheekbone, and on the left side of the child's body. The bruises on the boy's left side were described as fresh, while the bruises on his right forehead were considered to be older. The child was transferred to Rhode Island Hospital, where two doctors concluded that the child had suffered irreversible brain damage. He could not breathe on his own and there were no signs of brain activity. In addition, no verbal or spontaneous neurological responses to pain or other stimuli were exhibited by the child.

Dr. David Fletcher observed bruises on the boy's left cheek and left hip, as well as on the area of his back. These bruises were considered to be less than one or two days old, and possibly only two hours old. Dr. Fletcher testified that the injuries he observed were not consistent with a single fall from a bed twenty-four inches from the floor, which was the approximate height of the victim's bed.

The victim suffered cardiac arrest on May 9, and his condition deteriorated steadily to May 12, when an electroencephalograph revealed no electrical activity emanating from the child's brain. He was never removed from the respirator and, on May 15, 1980, he expired due to pulmonary edema. Forensic pathologist Dr. Arthur Burns, who served as deputy chief medical examiner for the State of Rhode Island, performed an autopsy on the body. Dr. Burns testified that death was due to acute pneumonia which was secondary to and caused by the cranial cerebral trauma which had resulted in subdural hemorrhage, cerebral edema, and subsequent coma.

The child's body, which weighed twenty-two pounds and measured thirty-two inches in length, had bruises on the

right forehead, left cheek and lower lip as well as on the left shoulder and hip. In addition, Dr. Burns observed a bruise measuring two and three-quarter inches by one and one-eighth inch on the back of the boy's head.

Dr. Burns testified that the injuries incurred by the child were inflicted by a severe blunt force such as a fist, a foot, a wall, or a door, and were not consistent with a fall from a bed twenty-four inches high, nor with a single fall down a flight of stairs. Further, the doctor concluded that the injuries suffered by the child could have occurred on May 8 and that it was not possible that the hematoma occurred before that date.

At some point after the defendant was arrested he was released into the custody of one Ellen Strang who, with her husband, posted the required bail. During a conversation with Mrs. Strang on June 19, 1980, the defendant stated that "he wondered sometimes if he hadn't killed [the victim] himself and just couldn't remember because he was stoned." However, at trial, the defendant testified that he was not "stoned" on the afternoon of May 8, 1980.

1. We are not persuaded by the defendant's argument that the evidence was insufficient to sustain the verdict of guilty of murder in the second degree. He states that the judge should have directed a verdict for the defendant upon so much of the indictment as charged murder, and should have submitted for the jury's consideration only the charge of involuntary manslaughter.

Murder is the unlawful killing of a human being with malice aforethought, and the distinction between murder and manslaughter is the presence or absence of malice. *Commonwealth* v. *Webster*, 5 Cush. 295, 303 (1850). The Commonwealth, to prove malice, need not prove that the defendant intended to kill the victim; it need only prove that the defendant intended "to do an act creating a plain and strong likelihood that death or grievous harm will follow." *Commonwealth* v. *Estremera*, 383 Mass. 382, 395 (1981), quoting *Commonwealth* v. *Huot*, 380 Mass. 403, 408 (1980).

Under this principle, the evidence was sufficient to sustain the jury's verdict. The victim was two years old and weighed twenty-two pounds. The defendant, who is five feet, ten inches tall, and weighs 155 pounds, severely and frequently struck the child on a daily basis during the three months preceding his fatal injury. On the evening of May 8, the mother left the child in the defendant's custody for twenty to thirty minutes. When she returned the child was severely bruised, unconscious, and not breathing. The defendant's conduct thereafter, in several respects, showed consciousness of guilt. Expert medical testimony showed that the primary cause of the child's death was a subdural hematoma; that the fatal injury, as well as the multisurface bruising which covered the boy's body, could not have resulted from the minor impact consistent with a single fall from a bed twenty-four inches high; that the trauma necessary to cause the fatal injury to the child was severe and was inflicted by a severe blunt force such as would be applied by a fist, a foot, a wall, or a door.

The evidence supports an inference that the head injury which was the primary cause of death resulted from a blow or blows of the defendant's hand or fist. This conclusion in turn supports an inference of malice which in turn supports the verdict of the jury. Ordinarily a blow with the fist does not imply malice. However, malice may be implied from a severe blow with the fist to an infant. See *Commonwealth v. Fratus*, 385 Mass. 551, 554 (1982); *Commonwealth v. Starling*, 382 Mass. 423, 425-426 (1981); *Commonwealth v. Cadwell*, 374 Mass. 308, 316-319 (1978). In *Starling*, we affirmed a conviction of an adult of murder in the second degree of a twenty-two month old child, where there was medical testimony that death was caused by very severe blows of a blunt instrument such as a fist, a foot, or a board. We concluded that "[t]he jury could find that according to common experience there was a plain and strong likelihood that death would follow the defendant's blow, and could infer that he foresaw serious injury." *Commonwealth v. Starling, supra* at 426.

2. We reject the defendant's argument that he is entitled to a new trial because the judge permitted the prosecutor to question a priest before the jury, concerning a private conversation with the defendant, after the priest had stated on voir dire that he would refuse to testify as to the conversation.

Father William Costello, an ordained Roman Catholic priest, was called to testify by the prosecution. The defendant requested a voir dire of the witness on the ground that Father Costello had previously indicated that there were certain private conversations about which he would refuse to testify. The defense at this point objected to the priest's testifying at all if he would not testify in full as to all the conversations he had with Kane.

In the absence of the jury, Father Costello testified that he had been alone in his car talking with the defendant on the evening of May 8, 1980, for fifteen to twenty minutes. However, Father Costello declined to divulge the substance of this conversation, stating, "I believe that my responsibility as a priest is to maintain confidentiality in relationship with a one-on-one type of relationship."

The defendant was sworn at a later voir dire and waived his rights under G. L. c. 233, § 20A,[2] consenting to disclosure of his private conversation with Father Costello. At that voir dire, the priest continued to refuse to testify as to the conversation. The judge concluded that there were relevant matters, other than the conversation, to which Father Costello could testify, and he also advised the priest that failure to testify before the jury as to the conversation would constitute contempt of court.

---

[2] General Laws c. 233, § 20A, inserted by St. 1962, c. 372, provides as follows: "A priest, rabbi or ordained or licensed minister of any church or an accredited Christian Science practitioner shall not, without the consent of the person making the confession, be allowed to disclose a confession made to him in his professional character, in the course of discipline enjoined by the rules or practice of the religious body to which he belongs; nor shall a priest, rabbi or ordained or licensed minister of any church or an accredited Christian Science practitioner testify as to any communication made to him by any person in seeking religious or spiritual advice or comfort, or as to his advice given thereon in the course of his professional duties or in his professional character, without the consent of such person."

The defendant filed a written motion that the Commonwealth be instructed not to inquire of Father Costello before the jury as to the fact that the priest had a conversation with the defendant. The motion was denied. Subsequently, after Father Costello had been examined before the jury as to other relevant matters, the prosecutor asked him about his conversation with the defendant. Over the defendant's objection, the priest was allowed to answer. He stated that his responsibilities as a priest required him to maintain the confidentiality of the conversation. The judge immediately instructed the jury that the defendant had waived his privilege and had agreed to have the priest testify to the content of the conversation. The judge instructed the jury "draw no inference, favorably or unfavorably, against the defendant . . . because of the Father's refusal to testify . . . on religious grounds." [3] Defense counsel then established on cross-exam-

---

[3] The following colloquy then took place in the presence of the jury:

THE JUDGE: "At this time I would say that the Court has made a previous determination in the absence of the jury that the defendant has indicated that he has waived his privilege, he has waived his right to that conversation remaining untestified to and has agreed to have it testified to. As I understand it now, Father, you are asserting your rights under canon law not to testify."

THE WITNESS: "Yes, your Honor."

THE JUDGE: "And as I understand it, the defendant's consent to his testifying is still in full force and effect. Is that correct?"

DEFENSE COUNSEL: "That's correct, Judge. I would ask you to so instruct Father Costello to testify to that conversation or to strike his previous testimony."

THE JUDGE: "Father, under the laws of the Commonwealth of Massachusetts, once the person who has talked to you privately has waived his privilege . . . you are required to respond to the question by repeating the conversation. Is it my understanding that you still decline and based on canon law?"

THE WITNESS: "Yes."

THE JUDGE: "I would say for the jury then, ladies and gentlemen, that the Father has declined to testify even though the law requires that he do so. I therefore would say, Father, that I direct you to testify. As I understand it, you decline to do so."

THE WITNESS: "I do."

THE JUDGE: "Despite my direction?"

THE WITNESS: "Yes, your Honor."

THE JUDGE: "For the record, that may be noted. I would say then, ladies and gentlemen, that he has testified as to what he has testified to up

ination that the priest's position had nothing to do with whether the conversation was incriminating to the defendant.

In the absence of the jury, the judge found Father Costello in contempt of court, and imposed a nominal fine against him. The judge then told the jury of his action and explained the reasons for his action. He said that "[i]n accordance with the law, the defendant granted his consent to have [the conversation in question] repeated or testified to." The judge again directed the jury "to draw no inference, favorable or unfavorable to the defendant . . . . As to the guilt or innocence of the defendant in this proceeding, insofar as the failure of the Father to testify, it is immaterial to the issue because you draw no inference from that. So I am making that very clear to you now."

The defense called an attorney, Mr. Alan Zwirblis, who had initially represented the defendant, and, after the defendant had waived his attorney-client privilege, Mr. Zwirblis recounted the defendant's version of his statement to the priest, as follows: "I can remember saying to the priest, 'This is incredible. I can't believe it. We have had so many problems and now this.'" Later, the defendant gave his version of the statement to Father Costello: "I just more or less expressed my concern for the baby and hoping that he was all right and asked if he knew what was going to happen with him."

---

to this point concerning what he observed, what he said, and what the defendant said is before you for evidence. He has declined to testify to a private conversation he had with the defendant, Peter Kane, in the motor vehicle between the Sturdy Memorial Hospital and Plainville. And therefore I would further direct you that the refusal of the Father to testify that you may draw no inference as to what that conversation was. You may draw no inference, favorably or unfavorably against the defendant, Peter Kane, because of the Father's refusal to testify. He has indicated that he has refused on religious grounds. Those are not legal grounds and I have directed him to testify and he has stated that he will not testify. Therefore I would ask you to not draw any inference as to what that conversation was or was not. It is not before you. It is not to be certainly inferred against the defendant because the Father has determined that he will not testify as to that conversation. You have heard his reasons and therefore the record may stand at that point."

The defendant argues that the judge's rulings, which allowed the jury to hear Father Costello's refusal to testify to the conversation, raised an impermissible inference that the defendant had made inculpatory statements and precluded the defense from conducting an effective cross-examination on this point.[4]

In concluding that the defendant is not entitled to relief, we apply a two-pronged test which has been established in cases like the instant one, where the witness, after making known in advance his intention to invoke a privilege not to testify, has nevertheless been permitted to state that position before the jury, and the defendant claims unfair prejudice as a result. The inquiry is (1) whether the prosecutor has so unfairly exploited the matter as to constitute prosecutorial misconduct, and (2) whether inferences from the witness's refusal to answer may have added critical weight to the prosecution's case. See *Namet* v. *United States*, 373 U.S. 179 (1963); *Commonwealth* v. *Cook*, 380 Mass. 314, 322-325 (1980); *Commonwealth* v. *Martin*, 372 Mass. 412, 414 (1977).

There is no allegation or showing that the prosecutor's actions or motives were improper. The prosecutor need not have accepted the defendant's version of the conversation at issue. Also, although a strong argument could be made that the prosecutor should have accepted Father Costello's decision at the time of the voir dire as final, nevertheless, it can be concluded that the prosecutor could reasonably have assumed that the priest might change his mind and testify, in light of the judge's admonishment. The prosecutor questioned the witness only once about the conversation; he included no "facts" in the form of leading questions, and he made no comment about the witness's recalcitrance in his closing argument. In brief, there is no showing that the prosecution consciously sought to build its case out of the inferences arising from Father Costello's silence.

---

[4] Whether the witness's claim of privilege was valid or invalid is not relevant to the immediate issues. *Commonwealth* v. *Fazio*, 375 Mass. 451, 459 n.2 (1978). Neither party suggests any error in the judge's rulings in this regard.

Nor is it shown that the priest's refusal to answer might have added critical weight to the prosecution's case. In addition to the prosecutor's conservative approach to the issue before the jury, there was a statement by the priest that his attitude did not depend upon the nature of the disclosures to him, whether incriminating or not. The judge immediately and forcefully directed the jury to draw no inferences, for or against the defendant, from the priest's silence, and the judge later reiterated these instructions. The defendant and his former attorney recounted for the jury the innocuous nature of the defendant's conversation with the priest. The priest was only one of many witnesses and his recalcitrance on this single issue was a brief episode in a relatively lengthy trial. Most important, a strong circumstantial case for the defendant's guilt was presented, and it can be fairly concluded that the conversation with the priest was, in context, insignificant.

We conclude that the judge's ruling on the defendant's motion that the prosecutor should not question Father Costello before the jury as to the conversation rested in his sound discretion, and we cannot say that he abused his discretion. The defendant emphasizes our statements in *Commonwealth* v. *Martin, supra* at 421 n.17, to the general effect that a witness should not be inquired of before the jury in a case where it is clear in advance that he will decline to answer, particularly where he has made his position clear under oath in a voir dire. See also *Commonwealth* v. *Labbe,* 6 Mass. App. Ct. 73, 79-80 (1978). However, in *Martin,* we also emphasized the principle that the prosecutor need not proceed on an assumption that the witness will ultimately balk when he is before the jury. Here, where the witness had been admonished, and where the judge was in a position to observe the witness, we cannot say that the judge's ruling was an abuse of discretion.

"[W]e do not allow ourselves the idle luxury of speculating on whether we would have acted differently" if we had made the rulings. *Commonwealth* v. *Cook, supra* at 325. We add that the cautionary note of *Martin,* as to cases where

it is clear that the witness will decline to answer, may not have received sufficient consideration from either the prosecutor or the judge. The prosecution pressed the matter before the jury when, so far as the record discloses, they had no specific information that the conversation, if disclosed, would be significant in its content. In the continued pursuit of the matter, an unnecessary appellate issue has been created, an issue which, but for the saving circumstances we have summarized, might have been sufficient ground for reversal of the judgment.

3. The defendant further argues that he is entitled to a new trial based on certain considerations relating to child abuse, particularly as discussed in *Commonwealth* v. *Cadwell*, 374 Mass. 308, 315-319 (1978). However, in that case, we noted that "there is no question of reducing the verdict below murder." *Commonwealth* v. *Cadwell, supra* at 316. See *Commonwealth* v. *Fratus*, 385 Mass. 551, 554 (1982); *Commonwealth* v. *Starling*, 382 Mass. 423, 427 (1981). The defendant's argument for relief under G. L. c. 278, § 33E, is inapposite, since, in the circumstances here, he is not entitled to such a review. *Commonwealth* v. *Davis*, 380 Mass. 1, 14-16 (1980).

*Judgment affirmed.*