846 A.2d 1065

Larry Scot SOMERS

v.

STATE of Maryland.

No. 1816, Sept. Term, 2002.

Court of Special Appeals of Maryland.

April 13, 2004.

William E. Nolan (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Rachel Marblestone Kamins (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: DAVIS, SONNER, and DEBORAH S. EYLER, JJ.

DEBORAH S. EYLER, Judge.

This case stems from the February 18, 2002 robbery of the Northend Liquor Store, known as "Margie's," in Hancock, Maryland. Two men now stand convicted of that robbery. The first, Jesse Johnson, pleaded guilty to robbery in the Circuit Court for Washington County. He was sentenced by the court and is serving time in prison. The second, Larry Scot Somers, is the appellant in this case. He was tried by a jury in the circuit court and was convicted of robbery with a dangerous weapon; theft over $500; reckless endangerment; carrying a dangerous weapon openly with intent to injure; first degree assault; conspiracy to commit a robbery with a dangerous weapon; and conspiracy to commit felony theft. He was sentenced to 15 years' imprisonment, all but six years' suspended in favor of probation, on the robbery conviction; and five years imprisonment for each of the two conspiracy convictions and for the weapons conviction, all to run concurrent to the 15-year sentence. The court merged the remaining sentences.

On appeal, Somers raises six questions, which we have rephrased slightly:

I. Did the trial court err by denying his motion for mistrial?

II. Did the trial court err by admitting evidence of his other crimes, wrongs, or bad acts, in violation of Rule 5–404(b)?

III. Was the evidence sufficient to sustain his conviction for carrying a dangerous weapon openly with intent to injure?

IV. Did the trial court err by not merging his conviction for carrying a dangerous weapon openly with intent to injure into his conviction for robbery with a dangerous weapon?

V. Did the trial court err by not vacating his conviction for conspiracy to commit felony theft?

VI. Did the trial court err by denying his request for a pre-sentence investigation?

For the following reasons, we shall vacate Somers's conviction for conspiracy to commit felony theft and his sentence for carrying a dangerous weapon openly with intent to injure; otherwise, we shall affirm the judgments.

## FACTS AND PROCEEDINGS

The State's theory of the case was that Somers and Johnson together planned and carried out the robbery of "Margie's." At trial, the State introduced evidence to support that theory, as follows.

The robbery happened on February 18, 2002, at a few minutes before 9:00 p.m. One clerk was on duty. He testified that a "two-tone blue Ford pickup" passed in front of the store and a man wearing a mask then ran inside, brandishing a light brown long-barreled rifle. The man put a mesh bag on the counter and demanded money. The clerk filled the bag with around $1,000. The man fled, running up an embankment in front of the store and onto Route 522. When the man was out of sight, the clerk called the police and reported the robbery. He gave the police a description of the pickup truck.

An off-duty state trooper testified that, right after the robbery was called in, he learned about the call and heard a description of the pickup truck. He drove to a restaurant on Route 522, near the bridge over the Potomac River into West Virginia, and parked his vehicle to observe traffic. At about

9:30 p.m., he spotted a two-tone blue and white Ford pickup truck with West Virginia tags. Two people were inside. The passenger turned and stared at him, allowing the trooper to see his face. Before trial, the trooper observed Jesse Johnson. At trial, he testified that Johnson was the passenger in the pickup truck.

Somers's ex-girlfriend testified that on the night in question she heard a police scanner report about a robbery involving a blue and white two-tone Ford pickup truck. She knew Somers drove a vehicle fitting that exact description, so she called him on the telephone and reached him at his father's house in West Virginia, where he lived. In the course of their 45-minute conversation, Somers admitted committing the robbery. A few days later, Somers again told her he had committed the crime, this time recounting the robbery in greater detail. He said he committed the robbery by himself, by parking his father's pickup truck on Route 522 and then returning to it to make a getaway. He also said he had driven over the bridge into West Virginia and had noticed a police car on the bridge.

Immediately after her first telephone conversation with Somers, on the night of the robbery, the ex-girlfriend called the Morgan County, West Virginia, Sheriff's Department and reported that she might have information about the driver of the vehicle suspected in the robbery. The West Virginia police contacted a Maryland State Police investigator, who telephoned Somers's ex-girlfriend. The ex-girlfriend told the investigator about her telephone conversation with Somers and gave him information about where he was living.

The investigator testified that, the same night, accompanied by West Virginia police, he went to Somers's parents' house. A two-tone blue and white Ford pickup truck with West Virginia tags was parked in the yard. Somers was present. He admitted that the pickup truck belonged to his father; that earlier that night he had driven the pickup truck on Route 522 westbound, across the bridge from Maryland into West Virginia; and that, as he was driving, the pickup truck had been

illuminated by the headlights of a police car. Somers also told the investigator that he owned a rifle matching the description of the one used in the robbery, and it was under his bed. With Somers's permission, the investigator searched under the bed, but found nothing. Somers could not explain where the weapon was. The investigator searched Somers's room and found $300 in $20 bills.

A teenaged girl who was living in Pennsylvania and was a friend of Somers testified that, on the night of the robbery, at about 10:00 p.m., Somers called her, in tears, and asked her to provide an alibi for him. Specifically, Somers asked her to say he had been with her that night, in Pennsylvania. Later the same night, he called her a second time and asked her also to tell the police that she was his girlfriend. When first interviewed by the investigator soon thereafter, the girl said that Somers had been with her on the night of the robbery. A few weeks later, when she realized the trouble she could face for lying, she told the investigator the truth, that Somers had not been with her that night.

The evidence showed that, at the time of the robbery, Johnson had been living in a house owned by one Bradford Spielman, up the street from Somers's parent's house. The Spielman house was occupied by Helen Hewett, who is Somers's cousin and Bradford Spielman's girlfriend, and three of Bradford's brothers: Wilbur, Alston, and Arloff Spielman. The Spielmans all had known Somers since he was a small child. Johnson had been staying at the Spielman house for a few weeks, because he had no place to live.

During the investigation of the robbery, Hewett and Wilbur, Alston, and Arloff Spielman gave the police written statements implicating Johnson and Somers in the robbery. The statements included information that Somers and Johnson had been overheard discussing plans for a robbery and that, on the night of the robbery, Somers and Johnson drove away in Somers's father's pickup truck and returned some time later carrying a large amount of cash and a rifle.

The State called Hewett and the three Spielmans as witnesses at trial. Their written statements all were introduced into evidence, either without objection or, in the case of Hewett, Alston, and Arloff, when they recanted all or some of the statements.

When called by the State, Somers's father testified that he owned a blue and white two-tone Ford pickup truck.

Johnson was called as a witness by the State. We shall discuss his testimony in detail in addressing the first question presented.

## DISCUSSION

### I

Somers first contends the trial court abused its discretion by denying a mistrial motion he made during Johnson's testimony.

As previously explained, Johnson pleaded guilty to the robbery and was incarcerated. This occurred before Somers went to trial. The specifics of Johnson's plea agreement are not in the record. Johnson did not pursue an appeal, to the limited extent that he was entitled to. His presence at Somers's trial was secured by the State on the first day of trial by a writ of habeas corpus.

In opening statement, the prosecutor forecast the testimony he expected to elicit from the State's witnesses, except for Johnson. The prosecutor told the jurors the State would be calling Johnson as a witness, that he had pleaded guilty to the February 18, 2002 robbery of "Margie's," for which the appellant was on trial, but that he did not know what Johnson was going to say: "He has not given a statement to anybody concerning his involvement [in the robbery], and again, at this point, I don't know what his testimony will be."

Johnson was the first witness called by the State. He did not invoke or attempt to invoke a Fifth Amendment privilege, or any testimonial privilege. On direct examination, he testified that he was residing in a Maryland prison because he had

robbed "Margie's" on February 18, 2002. He said he had entered into an agreement with the State in which he had admitted his involvement in the robbery. He further testified that he did not commit the robbery alone.

At that point in the examination, the prosecutor asked, "Who did you act with?" Johnson said, "I'd rather not answer." When the prosecutor asked why, Johnson said he felt "uncomfortable answering." The trial judge interjected and told Johnson he had to answer the question. The prosecutor again asked, "Who did you act with?" When Johnson said nothing, the prosecutor restated the question in another form: "Is that person in the courtroom today?" Johnson said, "I'd rather not answer." There was no objection during this line of questioning.

The trial judge excused the jury from the courtroom and held a bench conference. In answer to questions from the judge, Johnson said he had entered a guilty plea in connection with the robbery and that his case was not on appeal. The judge advised Johnson that he had no right to refuse to answer the prosecutor's question and, if he continued to do so, he could be held in contempt and sentenced to additional jail time for the contempt.

At that point, defense counsel moved for a mistrial. He acknowledged that Johnson did not have a Fifth Amendment right not to testify. He complained, however, that the prosecution was "fishing in front of the jury" and that, from Johnson's refusal to answer, "the jury knows right now what the answer is. He doesn't have to say one word, and I certainly can't cross-examine him because he's not testifying." The court denied the motion.

The jury was returned to the courtroom and the prosecutor again asked Johnson, "With whom did you act?" He responded, "I still refuse to answer the question." With that, the prosecutor ended his examination. The trial judge asked defense counsel whether he had any questions on cross-examination. Defense counsel said no, he "would just simply renew [his] motion."

The trial judge denied the motion again. Later in the proceeding, during a bench conference outside the jury's presence, the judge allowed counsel to state more clearly for the record the bases for their positions on the mistrial motion. The prosecutor explained that he had no advance knowledge that Johnson would refuse to answer any questions, or any particular question. He acknowledged that Johnson was not a model of cooperation, having complained to a state trooper in the courtroom that morning that he "didn't want to be here and didn't want to testify," but said that Johnson had not indicated he was going to refuse to answer questions once called to the stand. At the same time, and as he had told the jury in opening statement, he did not know precisely what Johnson's testimony would be.

Defense counsel repeated his position that Johnson's refusal to identify his accomplice was tantamount to his identifying Somers as that person, without the defense's being able to cross-examine on the point. He informed the court that Johnson's lawyer, who by then was present because contempt proceedings were scheduled to go forward that afternoon, had advised him before he took the stand that he did not have a Fifth Amendment right not to testify. Defense counsel said he and Johnson's counsel were "rethinking" that issue, however, on the ground that Johnson might be subject to prosecution in another jurisdiction, or in federal court, for his involvement in the robbery. There was no factual basis offered to support that argument, however.

The trial judge explained that he had denied the mistrial motion because Johnson was a compellable witness who had testified that he had committed the robbery for which Somers was on trial, and had not acted alone, but then had refused to answer the question seeking the identity of his accomplice; and that his refusal was ambiguous, in that it could have a number of meanings, many of which were inconsistent with Somers's guilt.

The trial continued. At the close of the evidence, counsel submitted proposed instructions, including the following curative instruction from the defense:

You cannot attribute the refusal of Jesse Johnson to present testimony as evidence of guilt of Scot Somers. The refusal of Jesse Johnson to testify may be motivated by a variety of factors some of which are fully consistent with the innocence of Scot Somers. So what I'm saying with this, ladies and gentlemen, Mr. Johnson testified. He presented some testimony. You can consider the testimony that he did give, but you must not consider or speculate as to the answers that he refused to give to certain questions. So that refusal to testify cannot be used against Scot Somers.

The court granted the instruction, reading it to the jury together with all the instructions at the end of the case. Thereafter, when asked about exceptions, defense counsel said that by seeking the curative instruction, he "was not trying to waive [his] request for a mistrial."

■■■ The decision to grant or deny a motion for mistrial is within the sound discretion of the trial judge. *Klauenberg v. State*, 355 Md. 528, 552, 735 A.2d 1061 (1999). Recently, in *Lai v. Sagle*, 373 Md. 306, 818 A.2d 237 (2003), the Court of Appeals reiterated the standard we apply in reviewing a trial judge's decision to deny a mistrial motion:

Whether to order a mistrial rests in the discretion of the trial judge, and appellate review of the denial of the motion is limited to whether there has been an abuse of discretion. Where the motion is denied and the trial judge gives a curative instruction, we must determine " 'whether the evidence was so prejudicial that it denied the defendant a fair trial;' that is, whether 'the damage in the form of prejudice to the defendant transcended the curative effect of the instruction.' "

*Id.* at 317, 818 A.2d 237 (quoting *Med. Mut. Liab. Ins. Soc'y of Md. v. Evans*, 330 Md. 1, 19, 622 A.2d 103 (1993)).

Somers makes three, related arguments to support his contention that the trial judge in this case abused his discretion by denying the mistrial motion. He maintains that this case is controlled by *Vandegrift v. State*, 237 Md. 305, 206 A.2d 250 (1965), in which the Court of Appeals condemned the

prosecutorial tactic of calling a witness to the stand in a jury trial for the purpose of having him invoke his Fifth Amendment privilege not to testify, and thereby to implicate the defendant. Somers argues that Johnson may still have had a Fifth Amendment privilege not to testify; and that, by calling him to the stand, and posing repeated questions about the identity of his accomplice, after he refused to answer that question, the State was trying to raise an improper inference that he (Somers) was the accomplice.

Characterizing Johnson's refusal to identify his accomplice in the robbery as "silence," Somers also argues that a mistrial was necessary because Johnson's "silence" was irrelevant and therefore inadmissible evidence that was prejudicial; and the prejudice could not be, and was not, cured by the instruction given to the jury. He maintains that the court's curative instruction (though requested by him) actually exacerbated the prejudice caused by Johnson's "silence."

In addition, Somers argues that Johnson's "silence" was, by inference, testimony that Somers was the other robber; but the testimony was not subject to cross-examination. The result, he maintains, was a trial conducted in violation of his Sixth Amendment right of confrontation. The only effective means of righting that violation was to grant a mistrial.

When Johnson was called to the stand, when the mistrial motion was made, and when the court ruled on the motion, the trial court and all counsel were proceeding on the basis that Johnson did not have a Fifth Amendment privilege, because he had pleaded guilty to the robbery and had not pursued an appeal. *See Ellison v. State*, 310 Md. 244, 250, 528 A.2d 1271 (1987) (holding that "the privilege against self-incrimination ... is not available to a witness whose prosecution on those charges has terminated by a guilty verdict"). Johnson was so advised by his own counsel. Only later, after Johnson's appearance at trial was completed and he had been discharged, did defense counsel mention that he and Johnson's lawyer were "rethinking" whether Johnson might still have had a right not to testify, because of the possibility of another

prosecution. Defense counsel did not offer any factual basis to support that assertion, and no such basis is offered in Somers's brief in this Court. On the record as it stood at the time of the testimony, and now, Johnson was a compellable witness.

Moreover, as the record makes plain, Johnson did not invoke or attempt to invoke the Fifth Amendment, or any other testimonial privilege. Rather, he took the stand and testified. By his in-court admission that he was the robber, he forfeited any constitutional basis for refusing to answer the prosecution's questions. *See Brown v. United States,* 356 U.S. 148, 153, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958) (holding that the Fifth Amendment privilege not to testify is not subject to selective invocation). He answered all the questions posed to him, except those seeking the identity of his accomplice, which he simply refused to answer.

In *Vandegrift, supra,* 237 Md. 305, 206 A.2d 250, four men were charged with crimes arising out of a barroom brawl. The defendant was tried separately from three co-defendants, and was tried first. Knowing the co-defendants would invoke their Fifth Amendment rights not to testify, the prosecutor called them as witnesses anyway, so the invocations would occur in front of the jury. The prosecutor then argued that the jurors could infer, from the invocations, that the co-defendants were guilty of the crimes arising out of the brawl, and further could infer that the defendant, who had been connected to the co-defendants by other evidence, was guilty too. The defendant was convicted.

In reversing the conviction, the Court of Appeals made plain that the prosecutor had acted in bad faith by calling witnesses he knew would properly invoke their constitutional rights not to testify, for the sole purpose of arguing an adverse inference from their invocations and using the inference against the defendant. After condemning that practice, the Court articulated five factors relevant to whether, in a given case, the practice caused prejudicial error:

1. that the witness appears to have been so closely implicated in the defendant's alleged criminal activities that the invocation by the witness of a claim of privilege when asked a relevant question tending to establish the offense charged will create an inference of the witness' complicity, which will, in turn, prejudice the defendant in the eyes of the jury;

2. that the prosecutor knew in advance or had reason to anticipate that the witness would claim his privilege, or had no reasonable basis for expecting him to waive it, and therefore, called him in bad faith and for an improper purpose;

3. that the witness had a right to invoke his privilege;

4. that the defense counsel made timely objection and took exception to the prosecutor's misconduct; and

5. that the trial court refused or failed to cure the error by an appropriate instruction or admonition to the jury.

237 Md. at 308–09, 206 A.2d 250.

This case is distinguishable from *Vandegrift* on several key points. The prosecution did not call Johnson to the stand to have him invoke the Fifth Amendment privilege in front of the jury, and then to argue guilt based on an adverse inference from that invocation. Johnson was thought by all involved to be a compellable witness who did *not* have a Fifth Amendment right or any other privilege not to testify. The prosecutor called Johnson to have him testify about facts within his knowledge that were central to the case. It is beyond peradventure that Johnson had knowledge of facts relevant to the charges for which Somers was on trial. Obviously, whether the robbery was committed by one person or more than one person, and the identity of one or both robbers, were critical facts; and Johnson was in possession of those facts.

Moreover, unlike the co-defendants in *Vandegrift*, Johnson did not invoke the Fifth Amendment, or any privilege, but in fact testified. His testimony established that the robbery was carried out by two people (at least) and that he was one of them. Johnson's testimony placing himself at the robbery

scene, taken together with the evidence placing Johnson in a vehicle matching the exact description of the one used by Somers and described by the store clerk, on the Route 522 bridge, and Somers's admission to having been in his vehicle on the bridge soon after the robbery, allowed a reasonable inference that the person Johnson acted with was Somers. The testimony given by Johnson plainly was relevant to whether Somers committed the robbery.

The cases Somers relies upon to characterize as "silence" Johnson's refusal to answer the prosecutor's question about whom he acted with also are distinguishable. They concern the probative value versus prejudicial effect of evidence that the accused, before being arrested and charged, did not inquire or speak up about the crime.

In *Snyder v. State,* 361 Md. 580, 762 A.2d 125 (2000), a husband was convicted of murdering his wife. At trial, the prosecution introduced evidence that, before the defendant was arrested and charged, he did not ask the police about the progress of their investigation. The Court of Appeals held that the trial court erred by admitting evidence of the defendant/husband's pre-arrest "silence," because it had slight probative value but significant and unfair prejudicial effect; in addition, the evidence invited speculation by the jury. Similarly, in *Grier v. State,* 351 Md. 241, 718 A.2d 211 (1998), the Court held that evidence that a suspect, before being arrested for a crime, did not volunteer his version of events to the police, had "little to no probative value" and therefore was not admissible as substantive evidence of his guilt. *Id.* at 253, 718 A.2d 211. The Court observed that "[e]vidence of a person's silence is generally inadmissible because '[i]n most circumstances silence is so ambiguous that it is of little probative force.'" *Id.* at 252, 718 A.2d 211 (quoting *United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975)).

The case at bar does not concern the admissibility of evidence of the fact of pretrial silence on the part of the defendant, a witness, or anyone. The prosecution did not attempt to introduce into evidence, as an item of evidence, any

person's pretrial silence on a relevant topic, for the purpose of arguing an inference from the silence. Rather, the prosecution called a witness, Johnson, who was in possession of relevant information, and conducted an examination of him, in the course of which he refused to answer a particular, highly pertinent, question. That refusal to answer was just that; it was not silence, and was not evidence of silence.

■ Finally, the cases Somers cites to argue that his Sixth Amendment confrontation right was violated are distinguishable.

In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), two defendants were tried together. Before trial, one of them, Evans, gave the police a written statement confessing to the crime and implicating the other defendant, Bruton. The statement was admitted at trial against both defendants. On appeal, Bruton argued that, because Evans was privileged not to testify, under the Fifth Amendment, the government had used the statement against Bruton without Bruton's having any opportunity to cross examine Evans about the statement. The Supreme Court agreed, and held that the pretrial confession should not have been admitted into evidence, because doing so violated Bruton's Sixth Amendment confrontation right.

*Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), also was a joint trial of two defendants. As in *Bruton*, one of the defendants, Bell, gave the police a written statement before trial confessing to the crime and implicating the other defendant, Gray. Seeking to circumvent the holding in *Bruton*, the prosecution redacted the statement by replacing Gray's name with a blank line. The statement was introduced into evidence in that condition. The Supreme Court held that the *Bruton* rule applied nevertheless.

■ In *Bruton* and *Gray*, the defendant who appealed was not able to cross-examine the witness who had given a statement against him because the witness was his co-defendant and had properly invoked the Fifth Amendment privilege not to testify. A witness who properly has invoked the Fifth

Amendment privilege is not available for cross-examination. *California v. Green,* 399 U.S. 149, 168 n. 17, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *Gray v. State,* 368 Md. 529, 538, 796 A.2d 697 (2002); *see also* Maryland Rule 5–804(a)(1) (defining unavailability of a witness, for purposes of an exception to the hearsay rule, as, *inter alia,* a situation in which the declarant is "exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement").

In this case, by contrast, Johnson did not give an out-of-court statement against Somers that the State was attempting to use. As explained, the State called Johnson as a witness to elicit testimony from him then and there, at trial. Unlike the co-defendants in Bruton and Gray, Johnson was a compellable witness, not one who was unavailable because of a Fifth Amendment claim of privilege. He appeared at trial and was subject to cross-examination by the defense, in that he could not properly refuse to answer questions on cross-examination. Johnson's refusal to answer one question on direct examination did not make him unavailable for cross-examination. He was available for direct and cross-examination, but simply refused to answer one of the questions posed to him on direct. This case also stands in contrast to *Tyler v. State,* 342 Md. 766, 679 A.2d 1127 (1996), in which the Court held that a compellable witness who refused to answer any questions when called by the State on direct examination was not subject to cross-examination, and therefore was "unavailable," so his prior testimony could not be admitted under the applicable hearsay exception. *Id.* at 775, 679 A.2d 1127. Indeed, in the case at bar, defense counsel had the opportunity to cross-examine Johnson, but declined.[1]

---

1. In *Crawford v. Washington,* 541 U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), relied upon by the dissent, the Supreme Court held that the confrontation clause bars admission by the State of a witness's out-of-court, testimonial statement, unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. The case at bar does not concern an out-of-court statement

■ While the cases Somers relies on all are distinguishable, they are nevertheless relevant, in that they concern a common principle: that the State's case against a criminal defendant only may be fairly based on affirmative evidence and not on inferences from non-evidence. Some cases, such as *Vandegrift*, address this principle in the context of a witness's proper invocation of a privilege not to testify. Others address the principle in the contexts of the improper invocation by a witness of a privilege or a witness's outright refusal to answer a proper question.

In *United States v. Maloney*, 262 F.2d 535 (2d Cir.1959), in which a witness properly invoked the Fifth Amendment before the jury, Judge Learned Hand observed that a witness's refusal to answer a question on the claim of privilege is not a permissible basis for inferring the answer the witness would have given, even if there is a logical basis for the inference; this is so because the presumed answer is not under oath or subject to cross-examination and, once in front of the jury, "there is a strong probability that [the answer inferred, but not given] will be taken as evidentiary." *Id.* at 537. Because a witness's invocation of the Fifth Amendment gives rise to "a natural, indeed almost inevitable, inference . . . as to what would have been his answer if he had not refused," a prosecutor who knows in advance that the witness will claim the privilege "is charged with notice of the probable effect [of that claim] on the jury's mind." *Id.*

A few years later, in *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), the Supreme Court addressed the issue of prejudice to a defendant from claims of privilege before a jury by witnesses who also had non-privileged testimony. The defendant in *Namet* was being prosecuted for participating in a bookmaking scheme in violation of the federal wagering tax law. Two witnesses, a husband and wife, also accused in the scheme, pleaded guilty to violating the laws themselves, and then were called by the government

---

(testimonial or otherwise) by Johnson, and Johnson was present at trial and available for cross-examination.

to testify. Each had some non-privileged evidence and some privileged evidence relevant to the case. Because of their guilty pleas, they could no longer claim the Fifth Amendment privilege with respect to their own conduct. They still faced conspiracy charges, however, and on that basis invoked the privilege in response to questions about the defendant's alleged illegal activities. Their appearances at trial thus took the form of some actual testimony and sporadic invocations of the Fifth Amendment. The defendant argued on appeal that he had been prejudiced by the invocations of privilege before the jury.

Observing that reversible error "is not invariably committed" when a witness invokes the Fifth Amendment before the jury, but rather depends on the surrounding circumstances, the Court identified two factors as being of prime importance in determining whether the conduct of the trial was prejudicial to the defendant: first, whether the government made "a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege," *id.* at 186, 83 S.Ct. 1151; and second, whether, in the circumstances of the case, the inferences arising from the witness's refusal to testify based on privilege "added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.* at 187, 83 S.Ct. 1151.

The Court held that there was no prosecutorial misconduct, especially given that the government "had a right to put [the non-privileged] evidence before the jury." *Namet, supra,* 373 U.S. at 188, 83 S.Ct. 1151. It further held that the few instances of the witnesses' invoking the privilege before the jury were not of material importance, and therefore did not warrant reversal. The Court took into account that there was lengthy, non-privileged testimony; that the witnesses' claims of privilege were "not the only source, or even the chief source, of the inference that the witness[es] had engaged in criminal activity with the defendant"; and that there had been no objection to the line of inquiry that produced the invocations and no request for a curative instruction. Noting with

acceptance lower court decisions rejecting arguments of reversible error when refusals by witnesses to testify, based on claims of privilege, were " 'no more than minor lapses through a long trial[,]' " the Court concluded that, "even when objectionable inferences might have been found prejudicial ... instructions to the jury to disregard them sufficiently cured the error." 373 U.S. at 187, 83 S.Ct. 1151.

In *Hagez v. State,* 110 Md.App. 194, 676 A.2d 992 (1996), this Court applied the factors identified by the Court in *Namet*—prosecutorial misconduct and the "critical weight" of adverse inferences in the State's case—in holding that a witness's improper invocation of the spousal privilege before the jury unfairly prejudiced the defendant's trial. The defendant was charged with murder in the shooting death of a man inside the witness's motel room. At the time of the crime, the defendant and the witness were a divorced man and woman. There was circumstantial evidence tending to show that the victim was romantically involved with the witness, *i.e.,* that the shooting happened in the context of a love triangle.

Before the grand jury, the witness testified about the circumstances of the shooting. A few days before trial, she and the defendant remarried. When the State called the witness to testify at trial, she claimed the spousal privilege. Even after the trial court ruled that the privilege did not apply, she refused to answer, invoking the privilege anyway.

This Court held that, assuming the spousal privilege was not properly invoked, and therefore the witness's refusal to testify was not legally justified, the trial court nevertheless erred in permitting the prosecutor to ask the witness (over repeated objections) a long, fact-laden series of leading questions, knowing she would respond to each one by invoking, albeit improperly, the spousal privilege. We observed that the prosecutor's extended inquiry was but an attempt to put before the jury, in question form, information that was not otherwise available as admissible evidence, and thereby "to construct its case from inferences derived from its own questions." *Id.* at 222, 676 A.2d 992. We concluded that the prosecutor's testimonial

questions that suggested answers not only by their leading form but also by raising the improper inference, from the witness's claim of the spousal privilege, that she had information damaging to him, added "critical weight" to the State's case. *Id.* at 222, 676 A.2d 992.

The Supreme Judicial Court of Massachusetts, in an informative series of cases, likewise applied the two *Namet* factors in deciding whether a criminal defendant's trial was prejudiced by the use of improper inferences when a witness incorrectly invoked a privilege and on that basis refused to answer questions posed; and also when, as here, a witness simply refused to answer properly posed questions.

In *Commonwealth v. Martin*, 372 Mass. 412, 362 N.E.2d 507 (1977), a church sexton was murdered in the course of a robbery. Physical and circumstantial evidence indicated that two men were involved: one took the sexton's collection bag and the other fired the shots that killed him. The defendant and co-defendant were charged in the crimes and were tried separately, with the co-defendant's trial going first. Part way through, the co-defendant pleaded guilty to second degree murder and armed robbery, and agreed to testify for the State at the defendant's trial.

When the prosecutor called the co-defendant as a witness at the defendant's trial, the co-defendant testified about peripheral facts. When asked questions directly pertaining to the crime, however, he said, "Fifth Amendment." 372 Mass. at 418, 362 N.E.2d 507. The trial court ruled that the witness had no privilege and directed him to answer. The co-defendant nevertheless repeated the claim of privilege in response to questions. The defense moved for a mistrial, which was denied, and the court instructed the jurors that, in deciding guilt or innocence, they were to put out of consideration the co-defendant's claims of privilege and refusals to answer.

On appeal after conviction, the defendant argued that the mistrial motion was improperly denied. Applying the *Namet* factors, the Massachusetts Supreme Court rejected that argument. It determined, first, that the prosecution did not act in

bad faith in calling and questioning the co-defendant. The co-defendant was a compellable witness that the Commonwealth was entitled to call:

> The factual situation sums up as one where a prosecutor need not go on an assumption that a witness, if called, will balk at testifying, but may make the test by actually calling him.

*Martin, supra,* 372 Mass. at 420, 362 N.E.2d 507. Also, the co-defendant actually answered some questions, giving testimony that, while peripheral, was relevant. Moreover, the prosecutor did not exploit the situation by posing "insistent or extended" questions "suggest[ing] particularized states of fact from which the jury might the more easily have drawn harmful inferences." *Id.* at 421, 362 N.E.2d 507.

The court further concluded that the co-defendant's refusals to answer did not lend improper weight to the prosecution's case: the questions were not testimonial, the trial court instructed the jury not to consider the claims of privilege and refusals to answer as evidence, and the entire record revealed a "thoroughly convincing case against the defendant on the charges ... entirely apart from any dubious aid the jury might have attempted to derive" from the co-defendant's claims of privilege and refusals to answer questions. *Id.* at 422, 362 N.E.2d 507.

Likewise, in *Commonwealth v. Kane,* 388 Mass. 128, 445 N.E.2d 598 (1983), the court applied the two factors in *Namet* in deciding whether the defendant's trial on charges of murdering his girlfriend's two-year-old son, by beatings that caused brain damage and eventual death, was unfairly prejudiced by a priest's refusal, on the basis of privilege, to answer questions about a conversation he and the defendant had on the night the child was admitted to the hospital. The privilege was not applicable, because the defendant had waived it. Nevertheless, in his testimony at trial, after the court ruled that the privilege did not apply, the priest claimed the privilege in response to questions and refused to answer. The court instructed the jurors not to draw any inference, favor-

able or unfavorable, from the priest's refusal to answer questions as to what the conversation had been.

On appeal, the court held that the defendant's trial had not been unfairly prejudiced by the priest's refusal to testify. It concluded that the prosecutor had not engaged in misconduct. The priest properly was called as a witness; when he improperly refused to answer questions, the prosecutor did not try to take advantage of the matter. He asked only one question about the conversation itself, which was not a fact-laden leading question, and did not comment on the priest's recalcitrance in closing argument. In addition, "[t]here was no showing that the prosecution consciously sought to build its case out of inferences arising from the [priest's] silence." *Id.* at 138, 445 N.E.2d 598.

The court further concluded that the priest's refusal to answer questions did not add "critical weight" to the prosecution's case. The jury was informed, both by the priest in his testimony and through cross-examination, that he was not answering because of his religious obligation, not because his responses would be adverse to the defendant's interests; the court gave a curative instruction; and other evidence in the case disclosed the substance of the conversation, and that it was not damaging to the defendant.

Finally, more recently, in *Commonwealth v. Fisher,* 433 Mass. 340, 742 N.E.2d 61 (2001), the court held that the defendant's trial on charges arising out of a shooting incident was not prejudiced when a witness who was the intended target of the shooting, but was not the person who was struck, refused to answer questions by the prosecutor about the incident. The witness, defendant, and shooting victim all knew each other; the shooting arose out of a feud between rival groups. The witness cooperated with the prosecution at first. By the time of the defendant's trial, the witness was in jail on other, unrelated charges. On the first day of trial, before opening statements, he told the prosecutor he was not going to testify, because he did not want to " 'rat on anybody.' " *Id.* at 348, 742 N.E.2d 61.

The trial judge was notified, and in a bench conference the defense did not object to the witness's being called to the stand. On direct examination, the witness answered a few preliminary questions, but when asked about the shooting incident said he was "not answering no more questions." *Id.* at 348, 742 N.E.2d 61. The judge excused the jury, instructed the witness he had no constitutional right not to answer, and told him he would be held in contempt if he did not do so. The witness repeated that he would not testify, at which point he was held in contempt and sentenced to 90 days in prison. The jury was returned and was instructed that the witness was not testifying in the case, that what testimony he had given was being struck from the record, and that they were not to consider anything he said in deliberating on their verdict. The court gave a second, similar curative instruction after the close of the evidence. The defendant was convicted.

On appeal, the defendant argued that the witness's refusal to answer questions was the functional equivalent of his invoking the Fifth Amendment before the jury; and that the defendant's trial thereby had been prejudiced. The court did not address the question of whether a witness's refusal to answer questions is tantamount to his invoking the Fifth Amendment before the jury, for purposes of assessing prejudice, holding that, even if the witness improperly had asserted the Fifth Amendment, "there would be no substantial likelihood of a miscarriage of justice." *Id.* at 350, 742 N.E.2d 61.

The court concluded that there was no prosecutorial misconduct because the prosecutor did not call the witness for the purpose of invoking a claim of privilege or raising improper inferences in the minds of the jurors. The prosecutor made the witness's reluctance known to the defense and the court and, at the time, it was "unclear whether [the witness] would refuse to answer any questions outright or . . . would simply be an extremely uncooperative witness." *Id.* at 351, 742 N.E.2d 61. The court observed: "That [the witness] ultimately refused to testify cannot now be transformed into prosecutorial misconduct." *Id.*

The court further determined that the witness's refusal to testify did not add "critical weight" to the prosecution's case: the witness did not explain the basis for his refusal to answer in front of the jury; and he was identified as an enemy of the defendant, and therefore, "whatever negative impressions the jury had of [the witness], they did not tarnish the defendant." *Id.* "At most, [the jurors] might infer that, as an inmate, [the witness] was reluctant to participate in any criminal proceeding." *Id.* In addition, the other testimony showed the witness was not in a position at the time of the shooting to have perceived the critical events, the prosecutor's opening statement did not forecast the witness's factual testimony, his closing statement did not reference the witness's refusal to testify, and the court gave two curative instructions. The court concluded that the witness's refusal to testify " 'could not have made the difference between acquittal and conviction.' " *Id.* at 352, 742 N.E.2d 61 (quoting *Commonwealth v. Martin, supra,* 372 Mass. at 422, 362 N.E.2d 507).

The factors discussed in *Namet*—whether there was prosecutorial misconduct and whether "critical weight" was added to the State's case from the use of impermissible inferences—are pertinent to deciding whether the trial court in this case abused its discretion by denying Somers's mistrial motion. In our view, those factors militate in favor of the court's exercise of discretion.

There was no prosecutorial misconduct in this case. As we already have observed, Johnson had knowledge of facts about the robbery of "Margie's" that were material and relevant to the State's case; and he was a compellable witness. The prosecutor was entitled to call him to the stand to testify. *See Namet, supra,* 373 U.S. at 188, 83 S.Ct. 1151. There is nothing in the record to show that the prosecutor called Johnson knowing he would refuse to answer questions, or any particular question, for the purpose of raising improper inferences from expected refusals to answer. (Indeed, there is nothing in the record to show that, before being called, Johnson intended not to answer questions, or any particular question.) To the contrary, the prosecutor told the trial

judge, and Somers does not dispute, that he did not know that Johnson would refuse to answer questions when called to the stand.

The surrounding circumstances showed only that Johnson was not happy about having been compelled to appear in court. Certainly, and especially given that Johnson had entered into a plea agreement with the State, the prosecutor was not required to assume from Johnson's negative attitude or stated displeasure about being called as a witness that he would not answer the questions posed to him and, on that possibility, refrain from calling or questioning him. *See Commonwealth v. Martin, supra,* 372 Mass. at 420, 362 N.E.2d 507.

In addition, the prosecutor was forthright about Johnson with the jury, the court, and defense counsel. He told the jury in opening statement he did not know what Johnson's testimony would be. He did not speculate about the substance of the testimony or attempt to forecast it for the jury. Also, the defense did not object to Johnson's being called to the stand by the State.

As noted, when called, Johnson gave testimony that was highly relevant, establishing that he had committed the robbery and had not done so alone. The prosecution was entitled to ask him the logical follow-up question—with whom did he act?—and to have him respond. When the question was posed, the defense did not object, and an objection based on relevance would have been frivolous. There is nothing in the record to suggest that the prosecutor asked the question to provoke a claim of privilege or a refusal to answer, or for any purpose other than to obtain an honest response, whatever the response might be. The fact that Johnson improperly refused to answer did not make the prosecutor's conduct in asking the question improper. *See Commonwealth v. Kane, supra,* 388 Mass. at 138, 445 N.E.2d 598.

Moreover, we are persuaded that, when Johnson refused to answer the follow-up question, the prosecutor did not attempt to exploit the situation. The question, which was open-ended

and not leading, was repeated twice in the same form in which it first was asked: once after the court initially directed Johnson to answer and once after the court advised Johnson, outside the jury's presence, of the contempt risk he faced by not answering. The prosecutor restated the question those times not to elicit a further refusal to answer but to give Johnson an opportunity to respond with full knowledge of the legal consequences of not responding.

The prosecutor also restated the question once in a somewhat leading form, by saying: "Is that person in the courtroom today?" Again, the question, which like the others was not objected to, was not asked to raise an improper inference, but to obtain a response from a witness who, until he was asked to identify his accomplice, had answered all the questions posed of him, including those damaging to himself.

While the question was leading in the sense that its focus was narrowed to those in the courtroom, it was not fact-laden and testimonial, that is, it did not recite, in the guise of interrogation, particularized facts that otherwise would not be put before the jury. The prosecutor's conduct in this case stands in stark contrast to the flagrant and deliberate effort by the prosecutor in *Hagez* to build his case on adverse inferences from an extensive, fact-laden inquiry that effectively made himself an unsworn witness. In addition, by posing the question, the prosecutor was not attempting to introduce to the jury irrelevant and damaging extrinsic information designed to taint its perception of Somers. *See by contrast Lai, supra,* 373 Md. at 324–25, 818 A.2d 237 (holding that trial court abused its discretion in denying mistrial motion when plaintiff's lawyer in medical malpractice case told jurors in opening statement that the defendant doctor had been sued five other times for malpractice); *Evans, supra,* 330 Md. at 24, 622 A.2d 103 (holding that trial court abused its discretion in denying mistrial motion when cross-examination of witness improperly put before the jury information about a prior bad-faith case against the same insurance company defendant and "the prejudice resulting from the improper examination . . . transcended the curative instruction").

In addition, although Somers complains that the prosecutor took advantage of the situation by referring to Johnson's refusals to answer in closing argument, the record shows that, in his initial closing, the prosecutor made no reference at all to Johnson's refusals to answer questions. Remarkably, in his closing, defense counsel raised the topic, stating, "you saw Jesse Johnson ... come into court and you saw what happened ... what he refused to do, and there is an inference certainly from that little episode that he's covering up for his good buddy [Somers]." Defense counsel then argued that the jurors should disregard any such inference, and follow the court's curative instruction. The prosecutor, in rebuttal response, said essentially the same thing, and only because the defense raised the issue. Ultimately, the prosecutor's remarks simply were a request to the jury to follow the curative instruction.

We further conclude that any inferences the jurors may have drawn from Johnson's refusals to answer the prosecutor's questions seeking the identity of his accomplice did not add "critical weight" to the State's case.

To be sure, being people of common sense, the jurors probably thought, when Johnson was called to the stand by the State, that the prosecutor hoped he would identify Somers as his accomplice. Likewise, if the State had not produced Johnson as a witness, the jurors might have thought the prosecutor feared that Johnson, if called, would identify someone other than Somers as his accomplice. *See United States v. Gernie*, 252 F.2d 664 (2d. Cir.1958) (observing, in the course of holding that trial court incorrectly sustained witness accomplice's invocation of Fifth Amendment privilege when witness had pleaded guilty to crimes in connection with those for which the defendant was being tried, that the government had a right to produce and question the witness in an effort to corroborate government agents' testimony; and ran the risk that, if it did not, the defense would argue that its failure was taken out of concern that the witness would not have provided corroboration). As previously explained, however, the prosecutor was entitled to make an effort to gain Johnson's testimo-

ny about the identity of his accomplice. The question is not whether the jury could or did draw an inference from the mere fact that the State called Johnson to the stand, but whether Johnson's repeated refusals to answer the accomplice question raised an inference adverse to Somers that added "critical weight" to the State's case.

The circumstances surrounding Johnson's refusal to identify his accomplice's identity would not necessarily have produced, in the juror's minds, the thought that Somers was the accomplice. The refusal was not based on a claim of privilege that itself implied a relationship of protection between Johnson and Somers. The refusal thus stands in contrast to one based on a claim of Fifth Amendment privilege, in which an adverse inference arises from the relationship of self, and attendant interest in self-protection; based on a claim of spousal privilege, and the attendant interest one spouse has in protecting the other; or based on a claim of priest-penitent privilege, and the attendant interest a priest has in protecting the confidence of a confession. The human relationships that underlie these privileges are what lead jurors to think, almost inevitably, that a refusal to answer based on a claim of privilege means the answer is being withheld to protect the accused, and therefore is damaging to the accused.

In the case at bar, the refusal to answer was not based on a claim of privilege arising out of a protective relationship and, moreover, the evidence at trial did not show that Johnson and Somers had the type of relationship that would have motivated Johnson to protect Somers. The evidence showed only that Johnson had lived in Somers's neighborhood for a few weeks before the robbery. There was no evidence that the two were related or knew each other before that brief period. The relationship between the men as shown at trial did not suggest that Johnson had a natural inclination, by virtue of his relationship to Somers, to protect Somers, and that his refusal to identify his accomplice was to accomplish that goal. The relationship thus did not further suggest that Somers needed protection, *i.e.*, was the accomplice.

In addition, Johnson's reason for not answering, as stated to the jury—that he felt "uncomfortable"—was ambiguous. Given his inmate status, he may have been uncomfortable identifying *any* person as his accomplice, whoever that person might be, and therefore only answered the questions about his own criminal agency. *See Commonwealth v. Fisher, supra,* 433 Mass. at 351, 742 N.E.2d 61.

On the other hand, Somers may have felt uncomfortable answering because Somers in fact was the accomplice, and he did not want to implicate him. As the trial judge pointed out in ruling on the motion for mistrial, Johnson could have been refusing to answer the question for a number of reasons, some consistent with Somers's guilt and some inconsistent with it. For much the same reasons given by the Court of Appeals in the "silence" cases Somers relies on, Johnson's refusal to identify his accomplice was liable to more than one interpretation and therefore did not compel an inference adverse to Somers.

The circumstances surrounding Johnson's testimony were not such as to have inevitably produced an inference, from Johnson's refusal to identify his accomplice, that Somers was the accomplice. Moreover, the possibility that such an inference might be drawn was susceptible of being cured by an instruction from the court. The curative instruction the court gave, at the request of the defense, was in our view sufficient to avert the possibility that the jurors might conclude, from Johnson's refusal to answer the accomplice question, that Somers was the accomplice.

In addition, the State's case did not depend on an adverse inference from Johnson's refusal to identify his accomplice. The State's case was built on evidence that a vehicle matching the description of Somers's car was used in the robbery; that Somers placed himself in that vehicle, not far from the robbery, on the night of the robbery, in the interview he gave to the investigator; that Somers twice confessed to the crime to his ex-girlfriend; that Somers attempted to line up an alibi; that Johnson, who admitted involvement, was seen soon after

the robbery, in a vehicle matching the description of Somers's vehicle and the description of the vehicle used in the robbery; and that the neighbors with whom Johnson was living witnessed conduct on the part of Johnson and Somers showing that they planned the robbery and then carried it out, together. The question that Johnson refused to answer did not place before the jury any new, additional factual information not covered by the State's affirmative evidence. It also is noteworthy that the defense did not object to any of the questions the State asked Johnson about the identity of his accomplice.

Any inference the jurors might have drawn, notwithstanding the court's curative instruction, was not of material significance to the State's case, so as to lend "critical weight." Irrespective of Johnson's refusal to identify his accomplice, there was ample affirmative evidence to support a finding beyond a reasonable doubt that Somers planned the robbery of "Margie's" with Johnson, and participated in perpetrating the robbery.

Somers's right to a fair trial was not prejudiced by Johnson's refusal to answer the questions, posed in good faith, seeking the identity of his accomplice; and any possible prejudice that could have resulted from the prosecution's repetition of the question, including the repetition that posed the question in leading form, did not transcend the curative effect of the instruction that was given to the jury.

■ Finally, while Somers did not waive the issue of the propriety of the ruling on the mistrial motion, by seeking a curative instruction he did waive the issues he now raises about the content of the instruction and its placement among the other instructions; he proposed the precise instruction that was given and did not object to its placement among the other instructions.

■ As explained above, the curative instruction that was given was proposed by the defense; the court gave it in the exact form in which it was proposed. Somers argues in his brief that the language of the instruction exacerbated the

prejudice he claims resulted from Johnson's refusal to answer the prosecutor's questions. Having sought and obtained the precise instruction he requested, Somers cannot now be heard to complain that the language of the instruction was prejudicial.[2] *Macklin v. Robert Logan Associates*, 334 Md. 287, 311, 639 A.2d 112 (1994); *Millstein v. Yost*, 197 Md. 348, 353, 79 A.2d 149 (1951). Moreover, there was nothing prejudicial about the wording of the instruction in any event. It properly directed the jurors not to consider or engage in speculation based on Johnson's refusal to answer questions, and not to use the refusal to answer against Somers.

 Somers also argues that the trial court's placement of the instruction among others addressing witness intimidation and evidence suppression prejudiced him, because it suggested that Johnson had refused to answer the question because Somers had intimidated him. Somers made no objection to the placement of the instruction; accordingly, this argument is not preserved for review. *See* Rule 8–131 (stating that the appellate court generally will not decide an issue unless it plainly appears by the record to have been raised in or decided by the trial court); Rule 4–325(e) (stating that "[n]o party may assign as error the giving or failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the ground of the objection").

## II.

 Somers next contends the trial court erred by admitting evidence of "other crimes" on his part, in violation of Rule 5–404(b), through the testimony of the off-duty state trooper who parked his car on the Route 522 bridge, and observed Somers's vehicle drive across it.

The trooper testified that he was standing outside his vehicle, looking at the road, when the blue and white pickup

---

**2.** In their briefs, neither Somers nor the State mentions that the curative instruction that was given was requested by the defense.

truck drove past. He took special note of the passenger, because he "was giving me such a stare basically. He had turned and was watching me as they went by." The trooper further testified that he could see the passenger's face through the rear window of the truck. The examination then proceeded as follows:

[STATE]: Can you generally describe the persons, the persons you saw in the vehicle?

[TROOPER]: The person I saw that night was … had a close-cut haircut. The hair appeared to be dark. I'd say it was early twenties. Other than …

[STATE]: Do you know what race they were?

[WITNESS]: White, yes. They were white … Male.

[STATE]: Are you familiar with the defendant Larry Somers?

[WITNESS]: I've seen him, and I know the name from other cases.

[DEFENSE]: Objection.

THE COURT: Overruled.

The trooper then testified that he could not identify Somers as either the driver or passenger in the pickup truck; but that, having seen Johnson in court that morning, he recognized him as the passenger in the pickup truck who had stared at him.

Somers complains that the trooper's testimony, that he knew Somers's name from other cases, was inadmissible "other crimes" evidence. We disagree. The prosecutor was seeking to determine whether the trooper could identify Somers as one of the occupants of the pickup truck, and in that context asked the somewhat vague question whether the trooper was "familiar" with Somers. The question was not objected to before it was answered. The first part of the trooper's response, "I've seen him[,]" appears to have been a reference to the fact that Somers was present in the courtroom. (Somers does not complain about this statement.) The second part of the answer, "I know his name from other cases[,]" was not a statement that Somers had committed other crimes. It was a statement that the trooper previously had heard Somers's

name in connection with other cases, which does not necessarily mean cases against Somers; the testimony just as well could mean that Somers was a witness, a victim, or otherwise peripherally involved in other cases, without having been accused or found guilty of any crime. Had the defense been concerned that, from the trooper's response to the vague question about "familiarity," the jurors could speculate that Somers had been convicted of a crime sometime in the past, a curative instruction should have been requested. No such request was made.

We cannot say that the court abused its discretion in overruling a late-made objection to a question that did not seek information about a past crime and produced an answer that did not directly elicit information about any criminal past on Somers's part.

## III.

 Somers next contends that the evidence was insufficient to support his conviction of carrying a dangerous weapon openly with the intent to injure.

 The standard of review for sufficiency of the evidence is whether, considering the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Smith*, 374 Md. 527, 534, 823 A.2d 664 (2003).

At the relevant time, Md. Code (1957, 1996 Repl. Vol.), Art. 27, § 36 provided:

(a) *In general.*—Every person who shall wear or carry any ... dangerous or deadly weapon of any kind, whatsoever (penknives without switchblades and handguns, excepted) concealed upon or about his person, and *every person who shall wear or carry any such weapon ... openly with the intent or purpose of injuring any person in any unlawful manner, shall be guilty of a misdemeanor,* and upon conviction, shall be fined no more than $1,000 or be imprisoned in

jail, or sentenced to the Maryland Department of Correction for not more than three years.

(Emphasis added.) [3]

Somers argues that the evidence viewed favorably to the State could not support the reasonable finding that he had an intent to injure the store clerk, as opposed to merely having an intent to frighten him. His one paragraph argument on this point is:

> In the instant case, in the light most favorable to the State, [Somers] entered Northend Liquors and ordered [the clerk], at gunpoint, to place the money from the register into the white mesh laundry bag. Such action, however, did not establish [Somers's] intent to injure [the clerk]. As defense counsel argued to the trial court, such evidence only established [Somers's] intent to frighten, as opposed to injure. If, in fact, an intent to frighten is encompassed within an intent to injure, then all robberies in which a weapon is displayed openly are likewise violations of the statute prohibiting the carrying of a dangerous weapon openly with intent to injure.

(Footnote omitted.)

The State responds that the testimony by the store clerk was sufficient circumstantial evidence of an intent or purpose to injure on Somers's part. The State points out that the clerk testified that the masked robber (which, as Somers concedes, the jury could have found was Somers) entered the store, carrying a mesh bag and a rifle with a scope. The robber then "raised [the] gun up," pointing it directly at him, and ordered him to put the money in the bag; and kept the gun pointed straight at him until he did so. The State maintains that the evidence that the gun was pointed directly at the clerk, at a vital part of his body, was sufficient to support a reasonable inference that he intended or had the purpose to injure the clerk.

---

**3.** That statute has since been recodified without substantive change as Md.Code (2003), section 4-101 of the Criminal Law Article.

■ To prove the specific intent or purpose to injure element of this crime, it is not necessary for the State to prove that the defendant committed an assault. *Brooks v. State,* 38 Md.App. 550, 552–53, 381 A.2d 718 (1978). It is necessary for the State to show the defendant openly carried one of the prohibited deadly or dangerous weapons and did so having the intent or purpose to injure—regardless of whether the weapon was used or an injury was inflicted.

■ Proof of the element of intent in a crime can be shown by circumstantial evidence, that is facts that permit a reasonable inference that the intent existed. For example, an intent to kill may be proven circumstantially, based on inferences drawn from the firing of a weapon directed at a vital organ of the body. *Smallwood v. State,* 343 Md. 97, 104, 680 A.2d 512 (1996); *State v. Raines,* 326 Md. 582, 591, 606 A.2d 265 (1992); *State v. Earp,* 319 Md. 156, 167, 571 A.2d 1227 (1990). *See also Martin v. State,* 203 Md. 66, 75, 98 A.2d 8 (1953) (holding that criminal intent may be shown by circumstantial evidence).

In the case at bar, the evidence showed that Somers was carrying the rifle (which no one disputes was a dangerous weapon), was masked, and was pointing the rifle directly at the sales clerk as he ordered him to put money from the cash register in a bag. These facts supported a reasonable inference that Somers was engaging in that conduct with the present intention and purpose to shoot the clerk, either as part of an effort to terrorize or to force compliance if the clerk did not accede to the demand for money. Somers's acts were sufficient to support an inference that he had an intent or purpose to injure the clerk with the dangerous weapon he was carrying. To be sure, the evidence also was sufficient to show that Somers intended to frighten the clerk with the weapon. The two intents—to injure and to frighten—are not mutually exclusive, however.

## IV. and V.

■ Relying on *Eldridge v. State,* 329 Md. 307, 619 A.2d 531 (1993), Somers contends the trial court erred by failing to

merge his sentence for carrying a dangerous weapon openly with the intent to injure into his conviction for robbery with a dangerous weapon. The State agrees. In addition, relying on *Tracy v. State*, 319 Md. 452, 573 A.2d 38 (1990), Somers contends the trial court should have vacated one of his conspiracy convictions. The State also agrees with that contention.

Just as in the case at bar, in *Eldridge, supra*, the defendant was convicted, *inter alia*, of armed robbery and carrying a dangerous weapon openly with the intent to injure. The Court of Appeals held that, when a defendant has been found guilty of armed robbery, and has been sentenced for that crime, it is contrary to common sense, and therefore to the intent of the legislature, to impose an additional sentence for the crime of carrying the weapon used in the robbery openly, with the intent to injure. On that basis, the Court vacated the defendant's sentence under Article 27, section 36. The Court's holding is directly applicable to this case. Accordingly, we shall vacate Somers's sentence for carrying a dangerous weapon openly with the intent to injure.

In *Tracy, supra*, the Court explained:

It is well settled in Maryland that only one sentence can be imposed for a single common law conspiracy no matter how many criminal acts the conspirators have agreed to commit. The unit of prosecution is the agreement or combination rather than each of its criminal objectives. In *Mason v. State*, 302 Md. 434, 445, 488 A.2d 955, 960 (1985), we stated that a conspiracy remains one offense regardless of how many repeated violations of the law may have been the object of the conspiracy.

319 Md. at 459, 573 A.2d 38.

As the State acknowledges, in the case at bar, the prosecution's theory was that Johnson and Somers engaged in a single conspiracy, albeit with more than one crime as its objective. Accordingly, Somers only was subject to a conviction and sentence for a single count of conspiracy. For that reason, we

shall vacate his conviction and sentence for conspiracy to commit felony theft.

## VI.

 Somers was sentenced the same day the verdict was returned. The following colloquy took place:

THE COURT: [Mr. Prosecutor], as to sentencing?

[STATE]: Your Honor, the State is ready to proceed with sentencing.

[DEFENSE]: Your honor, I request a pre-sentence investigation.

THE COURT: Denied. We will sentence today. [Mr. Prosecutor]?

Somers contends the trial court abused its discretion by failing to give him an opportunity to explain the basis for his request for a presentence investigation and by failing to exercise any discretion at all in denying the request for such an investigation. The State responds that Somers did not preserve his first argument for review and that his second argument is without merit.

Under Md.Code (2002), section 6–112(b)(1) of the Correctional Services Article ("CS"), a presentence investigation report is "[a]llowed," that is, may be ordered by the circuit court, prior to sentencing a defendant convicted of a felony or certain misdemeanors, "[i]f [the . . . court] is satisfied that a presentence investigation report would help the sentencing process[.]" CS section 6–112(b)(2) further provides that "[t]he party that requests the report has the burden of establishing that the investigation should be ordered." As this statute makes plain, the circuit court has discretion to order a presentence investigation report in cases such as the one at bar, and the defendant bears the burden of showing the need for the investigation and report.

Here, Somers requested a presentence investigation, but made no showing of a need for such an investigation. Contrary to the argument he advances, the record does not reflect

that he was not permitted by the court to give a reason why a presentence investigation was needed; it shows that he did not give a reason and did not attempt to give a reason.

We disagree with the State that this is a matter of non-preservation. Clearly, Somers sought a presentence investigation and the court ruled, turning the request down. The court did not abuse its discretion in so ruling, however, because Somers offered nothing to show a need for a presentence investigation. Also, there is nothing in the record to indicate that the court in so ruling did not exercise any discretion. The court did not say or do anything to show that it was acting in a rote fashion, out of a routine that did not depend on the particulars of the given case. *See Hossaink-hail v. Gebrehiwot,* 143 Md.App. 716, 725, 795 A.2d 816 (2002) (citing *Hart v. Miller,* 65 Md.App. 620, 627, 501 A.2d 872 (1985) (holding that a trial court errs when, instead of exercising discretion in deciding a discretionary issue, it merely adheres to a uniform policy)). Rather, the court appears simply to have exercised its discretion to deny the request on the basis that no showing was made to support it.

**JUDGMENT OF CONVICTION FOR CONSPIRACY TO COMMIT FELONY THEFT VACATED; SENTENCE FOR CARRYING A DANGEROUS WEAPON OPENLY WITH THE INTENT TO INJURE VACATED; JUDG-MENTS OTHERWISE AFFIRMED. COSTS TO BE PAID ONE–HALF BY WASHINGTON COUNTY AND ONE–HALF BY THE APPELLANT.**

Dissenting Opinion by SONNER, J.

SONNER, Judge, dissenting.

I respectfully dissent. By affirming the court below, the majority minimizes the damage and harm that the denial of the right to cross-examine a critical witness had upon appellant's trial. The State presented Jesse Johnson to the jury as its very first witness. He declared that he was one of two people who committed an armed robbery, but then refused to answer any questions about his accomplice. The appearance

of that witness, the set of questions posed to him, and the court's treatment of his recalcitrance, without a doubt, permitted the jury to infer that Larry Somers was his one accomplice. There is no other conclusion that the jury could reach. Somers could not impeach the witness or cross-examine him in any way, so the damaging inference of his guilt lingered untouched throughout the trial.

Wigmore wrote that cross-examination is "the greatest legal engine ever invented for the discovery of truth." 5 JOHN HENRY WIGMORE, EVIDENCE § 1367, at 32 (James H. Chadbourn rev. ed., 1974). The right of cross-examination is firmly rooted in our constitutional law. *See Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In a recent decision from the Supreme Court of the United States, Justice Antonin Scalia, characterized cross-examination to be as important as the fundamental right to trial by jury, and just as indispensable. *See Crawford v. Washington*, 541 U.S. ——, 124 S.Ct. 1354, 1371, 158 L.Ed.2d 177, 2004 WL 413301, at \*15 (U.S.Wash.2004).[1] In overturning the Washington state conviction for first degree assault, the Court held that the right to confront witnesses was so fundamental that the admission of a statement with indicia of reliability, but that the defendant could not cross-examine, transgressed the Sixth Amendment and required reversal. The Court saved for another day whether appellate courts should apply a harmless error analysis to such violations. *See id.* at 1359 n. 1, 2004 WL 413301 at \*5 n. 1.

In *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), the Supreme Court reversed a Virginia state murder conviction that derived from an accomplice's confession, and remanded it to the state for a determination of harmless error under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Justice Stevens, however,

---

1. The Court remarked: "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with a jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Crawford*, 541 U.S. ——, at ——, 124 S.Ct. 1354, 1371, 158 L.Ed.2d 177, at ——, 2004 WL 413301, at \*15.

doubted that an accomplice's confession implicating an accused, without the balancing effect of cross-examination, could ever pass constitutional challenge. *See Lilly,* 527 U.S. at 137, 119 S.Ct. 1887. In light of the emphasis in *Crawford* as to the importance of the right of confrontation to the structure of a fair trial, a finding of harmless error seems even less likely today than when the Supreme Court decided *Lilly.*

*Vandegrift v. State,* 237 Md. 305, 308–09, 206 A.2d 250 (1965), clarified that calling a witness, who refuses to testify, to allow jurors to infer from the refusal the substance of the unrevealed testimony is a forbidden trial tactic that may warrant a new trial. As the majority sets out in its opinion, maj. op., at 294, 846 A.2d 1073, *Vandegrift* identified five factors, the presence of which could establish prejudicial error for the calling of the witness. An important point is that the defendant need not meet all five factors to demonstrate reversible error. *See Adkins v. State,* 316 Md. 1, 13, 557 A.2d 203 (1989). Indeed, to my mind, this case exemplifies how a strong showing of an improper inference of complicity, the *Vandegrift* factor one, can be enough to warrant reversal, even without a showing of prosecutorial bad faith, factor two, or the existence of the right to invoke the privilege against self-incrimination, factor three. Neither bad faith nor the right to invoke the privilege really affects the determination of, or the harm from, a prejudicial inference of guilt.

The fact of the matter is that, after learning of Johnson's hostility, the prosecutor continued, intentionally, to propound questions that allowed the jurors to conclude that Somers was the second robber. Nothing is so illustrative of this intent as the particular question to Johnson about whether his accomplice was "in the courtroom today." *See* maj. op., at 289, 846 A.2d 1070–71. It was perfectly clear to the jury by then, if it had not been before, that the prosecutor wanted Johnson to identify Somers, and no one else.

Once the court excused the jurors and questioned Johnson out of their presence, all participants knew that further questioning would lead to nothing except more refusals to testify. When the prosecutor resumed his questioning in front of the

jury, he accented the improper inference one more time. It was hardly acting in bad faith for the prosecutor to ask the questions, having obtained the court's permission to do so, but the effect upon the trial and Somers's rights were exactly the same as if the State had defied the court and deliberately fostered the improper inference. I find the majority's conclusion that the inference from the refusal was possibly ambiguous somewhat strained. *See* maj. op., at 309–10, 846 A.2d 1082–83. The sum total of the interchange was the un-cross-examined testimonial inference that Somers robbed the store.

Whether or not to declare a mistrial is clearly a decision that ordinarily falls within the broad discretion of the trial court and should not be second guessed on appeal, except in rare occasions. *See Hudson v. State,* 152 Md.App. 488, 521, 832 A.2d 834 (2003). Nevertheless, Johnson was the first witness in this trial, so the presiding judge and the jury had invested only a short time in the proceedings. Relative to other criminal cases of alleged error that we see on appeal, Johnson's behavior was the kind of extraordinary occurrence that a declaration of mistrial could have quickly and effectively cured. I would hold therefore that, under the circumstances, the trial court's refusal to declare a mistrial was an abuse of discretion. I take no issue with the majority's treatment of the other issues raised in the appeal.